En el Tribunal Supremo de Puerto Rico

| El Pueblo de Puerto Rico Recurrido V. José L. Ortiz Vega y Eugenio J. Rodríguez Galindo Peticionarios | Certiorari 99 TSPR 150 |
|---|---|

Número del Caso: CC-1999-0297

Abogados de la Parte Peticionaria: Lcdo. Carlos Peña Ramos
Lcdo. Angel M. González
Lcdo. Roberto Alonso Santiago
Lcdo. Thomas Rivera Schatz

Abogados de la Parte Recurrida: Oficina del Procurador General
Lcda. Rose Mary Corchado Lorent
Procuradora General Auxiliar

Tribunal de Primera Instancia, Sala Superior de San Juan

Juez del Tribunal de Primera Instancia: Hon. Lourdes V. Velázquez Cajigas

Tribunal de Circuito de Apelaciones: Circuito Regional I

Panel Integrado por: Hon. Fiol Matta
Hon. Rodríguez de Oronoz
Hon. González Román

Juez Ponente: Hon. Rodríguez de Oronoz

Fecha: 10/8/1999

Materia: Art. 82 y otros

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

       v.                              CC-1999-297       CERTIORARI

José L. Ortiz Vega y
Eugenio J. Rodríguez Galindo

    Acusados y Peticionarios

Opinión del Tribunal emitida por el Juez Asociado señor Fuster Berlingeri

San Juan, Puerto Rico, a 8 de octubre de 1999.

Tenemos la ocasión para determinar si en la vista preliminar para acusar, el Ministerio Público viene obligado a entregarle al imputado copias de escritos e informes sobre manifestaciones supuestamente exculpatorias hechas antes por un testigo cuyo testimonio el Ministerio Público ha de usar en tal vista para establecer que existe causa probable.

I

Se narran a continuación sucintamente los hechos que son pertinentes al asunto ante nuestra consideración.

El 16 de noviembre de 1998 un agente policiaco presentó sendas denuncias contra los peticionarios José L. Ortiz Vega y Eugenio J. Rodríguez Galindo,

imputándoles que el 8 de junio de 1997 éstos secuestraron y asesinaron a la menor Liliana Bárbara Cepeda en los predios del complejo recreativo El Escambrón en San Juan.

Un mes más tarde, el 16 de diciembre de 1998, se celebró la vista preliminar que aquí nos concierne y se determinó causa probable para acusar a los imputados por la comisión de los delitos de asesinato en primer grado, secuestro, y violación a la Ley de Armas. La determinación de causa probable referida se fundamentó en el testimonio único de Eliezer Santana Báez (alias "Mala Muerte"), quien testificó, en esencia, que había presenciado parte de los hechos imputados a los peticionarios.

El 14 de enero de 1999, se celebró el acto de lectura de acusación.

Así las cosas, el 20 de enero de 1999, los acusados presentaron ante el foro de instancia sendas mociones al amparo de las Reglas 64(p), 252 y 234 de Procedimiento Criminal de Puerto Rico, 34 L.P.R.A. Ap. II. Adujeron que luego del acto de lectura de acusación y a raíz de una solicitud de descubrimiento de prueba, la defensa de los acusados había obtenido unos informes policiacos y una cinta grabada de los cuales surgían manifestaciones exculpatorias de Santana Báez respecto a los acusados. Conforme a estos informes y a la cinta aludida, antes de celebrarse la vista preliminar el único testigo de cargo había declarado varias veces que no estuvo presente en el lugar en cuestión en el momento en que supuestamente ocurrieron los hechos imputados a los peticionarios. Mas aun, Santana Báez también había declarado que los agentes del Cuerpo de Investigaciones Criminales (C.I.C.) le habían inducido a mentir respecto a los supuestos hechos de este caso.

En las mociones referidas, la defensa planteó, además, que los informes y la cinta aludidos habían estado en manos del Ministerio Público antes de que se celebrara la vista preliminar en el caso, y que dichos documentos no fueron entregados a la defensa hasta después de celebrada dicha vista el 15 de enero de 1999. Por razón de lo anterior, los peticionarios solicitaron, inter alia, la desestimación de las acusaciones, por entender que se había determinado causa probable contrario a derecho, con prueba perjura, viciada y manipulada.

Luego de celebrar una vista evidenciaria para considerar los planteamientos de los peticionarios aludidos en el párrafo anterior, el foro de instancia declaró sin lugar las mociones referidas.

Inconformes con este dictamen, los peticionarios acudieron ante el Tribunal de Circuito de Apelaciones, Región Judicial de San Juan. Mediante petición de Certiorari, adujeron el siguiente señalamiento de error:

> "Erró el Honorable Tribunal de Primera Instancia al declarar No Ha Lugar la solicitud de desestimación de las acusaciones de los peticionarios, resolviendo como consecuencia que la defensa no tenía derecho antes de la celebración de la Vista Preliminar a declaraciones anteriores hechas por el testigo principal de cargo que declaró en dicha Vista Preliminar, máxime cuando el fiscal conocía que dichas declaraciones eran exculpatorias, y teniéndolas, las ocultó a la defensa; lo cual violó el derecho constitucional de los peticionarios a un Debido Proceso de Ley."

El foro apelativo denegó la expedición del recurso solicitado por los peticionarios. En esencia, en lo pertinente, resolvió lo siguiente:

> Cierto es que el imputado tiene derecho a obtener cualquier declaración, jurada o no, del testigo que haya declarado en vista preliminar una vez finalice el interrogatorio directo y antes de comenzar el contrainterrogatorio. De esta manera el imputado podrá estar en posición de impugnar la credibilidad del declarante durante esa misma vista. Pueblo v. Rivera Rodríguez, Op. de 31 de marzo de 1995, 138 D.P.R. ___, 95 JTS 36.

> En este caso el Ministerio Público no puso a la disposición de la defensa escritos, informes y una grabación del testigo Eliezer Santana Báez en los que éste se contradecía respecto a lo afirmado en la declaración jurada prestada ante el Ministerio Fiscal. Aunque ello le hubiese permitido a la defensa impugnar la credibilidad de Santana Báez en vista preliminar, de los escritos y prueba presentada por la defensa en la vista evidenciaria no surge que el tribunal hubiese variado su determinación en vista preliminar,

si hubiera evaluado la totalidad del testimonio de Santana Báez.

Inconformes también con este dictamen, los peticionarios acudieron ante este Tribunal el 20 de abril de 1999. Luego de varios trámites procesales, el 27 de mayo de 1999, emitimos finalmente una orden al Ministerio Público para que, en lo pertinente, mostrase causa por la cual no debíamos expedir el recurso solicitado, revocar el dictamen del foro apelativo, y devolver el caso al foro de instancia para celebrar nuevamente la vista preliminar. El Ministerio Público presentó su escrito en cumplimiento de nuestra orden el 15 de junio de 1999, y los peticionarios replicaron el 25 de junio del año en curso. Con el beneficio de ambos escritos, pasamos a resolver según lo intimado.


II

Antes que nada, es menester precisar en qué consisten exactamente las supuestas declaraciones exculpatorias del testigo de cargo que aquí nos conciernen.

Según lo narra el propio Procurador General de Puerto Rico en uno de sus escritos ante nos, y conforme a los documentos que obran en autos, en septiembre de 1998, diez y ocho meses después de la notoria muerte de la niña Lilliana Bárbara Cepeda, luego de que en una conferencia de prensa el Secretario de Justicia Fuentes Agostini le hubiese comunicado al país que no existía aún evidencia suficiente para encausar criminalmente a persona alguna, llegó a la atención de los investigadores del caso que Eliezer Santana Báez tenía conocimiento de los hechos que culminaron en la muerte referida.

Santana Báez se encontraba entonces recluído en una institución juvenil. Allí había manifestado que uno de los supuestos co-autores de los hechos, Eugenio J. Rodríguez Galindo, a quien Santana Báez conocía bien, le había admitido que él y Ortiz Vega habían dado muerte a Barbarita. Según esta versión de los hechos, Santana Báez no había participado en el secuestro y muerte de la niña. Sólo conocía de ello

porque Rodríguez Galindo se lo había contado. El 22 de octubre de 1998, Santana Báez fue sometido a un examen poligráfico respecto a la referida manifestación. El 12 de noviembre de 1998, el poligrafista rindió un informe al C.I.C. en el cual concluía que en su opinión Santana Báez había mentido en la prueba poligráfica.

Días más tarde, el 16 de noviembre de 1998, dos fiscales le tomaron una declaración jurada a Santana Báez, en la cual éste ofreció otra versión de los hechos. En dicha declaración Santana Báez manifestó, en lo esencial: 1) que conocía personalmente a uno de los dos acusados, a Eugenio J. Rodríguez, ya que en varias ocasiones habían cometido robos juntos, habían usado marihuana y heroína juntos, y se habían prostituído juntos para conseguir dinero; 2) que el 8 de junio de 1997 él (Santana Báez) estaba con Rodríguez en El Escambrón cuando éste secuestró a la niña y la golpeó en la cabeza; 3) que luego apareció Ortiz Vega y junto con él (Santana Báez) escondieron a la niña inconsciente en un sembrado de uvas playeras del área; 4) que entonces él (Santana Báez) se fue del lugar y al otro día Rodríguez le contó que la niña se había despertado mientras Ortiz la violaba, por lo que ellos dos tuvieron que matarla.

Luego de haber prestado la declaración jurada aludida, Santana Báez fue trasladado al Albergue para Protección de Víctimas y Testigos. Ello se hizo a petición del propio Santana Báez, quien temía por su vida en la institución donde estaba recluído.

El 27 de noviembre de 1998, Santana Báez se fugó del Albergue, pero fue apresado el día siguiente. Uno de los agentes del Negociado de Investigaciones Criminales (N.I.E.) que intervino con Santana Báez luego de éste haber sido apresado preparó un informe de incidencias el 28 de noviembre de 1998 en el cual relataba, inter alia, que Santana Báez: 1) le había manifestado que nunca presenció el secuestro de la niña; y 2) que había mentido en la declaración jurada, respecto a la afirmación de que estuvo presente en el lugar de los hechos, porque agentes del C.I.C. le habían advertido que si sólo declaraba que uno de los acusados le

había contado lo sucedido, no tenían caso. Este informe le fue referido al Fiscal Edwin Vázquez Berríos el 2 de diciembre de 1998.

Posteriormente Santana Báez grabó en el Albergue una declaración mediante la cual volvió a negar haber participado en los hechos referidos, y afirmó otra vez que tenía conocimiento de éstos sólo porque Rodríguez se lo había contado. En dicha grabación, Santana Báez manifestaba, además, que mientras estaba recluído en la institución juvenil un agente del C.I.C. le había aconsejado que declarase que estuvo presente cuando el secuestro de la niña, para que así se le pudiese sacar de la cárcel donde se encontraba y donde corría peligro de muerte. Santana Báez señaló también que él sabía que allí lo querían matar porque él había dicho que conocía a uno de los que habían asesinado a Barbarita. Temiendo por su vida, pues, accedió a lo propuesto por el agente del C.I.C., para que lo trasladaran a un lugar más seguro. Esta grabación, con el informe correspondiente, fue enviada al fiscal Edwin Vázquez el 2 de diciembre de 1998, quien la remitió luego a la Fiscalía de Distrito de San Juan.

El informe de incidentes del C.I.C. aludido antes, y la grabación referida, no le fueron entregados a los abogados de los peticionarios antes de la vista preliminar en la cual se encontró causa probable para acusarlos por el secuestro y la muerte de Barbarita. Tampoco se le entregó copia del informe poligráfico antes de dicha vista. Por ello aducen los peticionarios que si hubiesen tenido dichos informes y la cinta de grabación referidos, el contrainterrogatorio e impugnación del testigo de cargo en la vista preliminar hubiese sido dirigido a destruir efectivamente la credibilidad de éste en cuanto a si tenía conocimiento personal de los hechos, y que con toda probabilidad el foro de instancia hubiese determinado entonces que no existía causa probable. Alegan, más generalmente, que la ocultación de evidencia exculpatoria no sólo constituye un acto nefasto para la administración de la justicia criminal en el país sino que además, constituye una violación al debido

proceso de ley, independientemente de la etapa de los procedimientos penales en que ello ocurra.

Por su parte, el Procurador General alega, en esencia, que los peticionarios sólo tienen derecho a recibir la evidencia supuestamente exculpatoria luego de haberse presentado la acusación correspondiente; es decir, que tienen derecho a tenerla para prepararse para el juicio pero que no tienen tal derecho respecto a la vista preliminar.

Veamos quién tiene razón.

III

Para resolver la controversia ante nos en el caso de autos, es menester ponderar una vez más, en lo pertinente, la naturaleza y propósitos de nuestro procedimiento de vista preliminar para acusar.

Como se sabe, en nuestra jurisdicción la vista preliminar para acusar existe para determinar si el Estado tiene una adecuada justificación para someter al imputado a juicio. No es un procedimiento para la adjudicación final de la inocencia o culpabilidad de la persona a quien se le ha imputado la comisión de un delito grave. Su función esencial es la de evitar que se someta a la persona imputada a los rigores de un proceso criminal sin que existan suficientes fundamentos que lo justifiquen. Pueblo v. Vega Rosario y Otros, Op. del 1 de julio de 1999, ___ D.P.R. ___, 99 JTS 114; Pueblo v. Andaluz Méndez, Op. de 30 de junio de 1997, 143 D.P.R. ___, 97 JTS 107; Pueblo v. Vallone, Op. de 24 de mayo de 1993, ___ D.P.R. ___, 93 JTS 79; Pueblo v. Padilla Flores, 127 D.P.R. 698 (1991); Pueblo v. Rivera Alicea, 125 D.P.R. 37 (1989); Pueblo v. Rodríguez Aponte, 116 D.P.R. 653 (1985); Pueblo v. Opio Opio, 104 D.P.R. 165 (1975). "Además, es un mecanismo que sirve el propósito de impedir que acusaciones frívolas e insustanciales recarguen la labor del sistema de justicia, consumiendo el tiempo de los jueces, fiscales, jurados y demás funcionarios que han de intervenir en el

juicio." Pueblo v. Rodríguez Aponte, supra, a la pág. 665, nota 3; Hernández Ortega v. Tribunal Superior, 102 D.P.R. 765 (1974).

Al amparo de la Regla 23 de Procedimiento Criminal de Puerto Rico, 34 L.P.R.A. Ap. II, reiteradamente hemos resuelto que la vista preliminar, aunque es propiamente un procedimiento judicial, no es un "mini juicio". Por ende, el Ministerio Público no está obligado a presentar prueba de tal manera convincente como para sostener una convicción. Pueblo v. Rivera Rivera, 122 D.P.R. 862 (1988); Pueblo v. Rodríguez Aponte, supra; Pueblo v. Figueroa Castro, 102 D.P.R. 279 (1974). La responsabilidad del Ministerio Público se cumple con presentar prueba que demuestre que es probable que determinado delito ha sido cometido y que es probable que dicho delito lo cometió el imputado. Del Toro Lugo v. Estado Libre Asociado de Puerto Rico, Op. de 12 de septiembre de 1994, 136 D.P.R. ___, 94 JTS 119; Pueblo v. Rivera Alicea, supra; Pueblo v. Rodríguez Aponte, supra.

Por otro lado, la propia Regla 23 dispone que en la vista preliminar el imputado "podrá contrainterrogar los testigos en su contra y ofrecer prueba a su favor." Hemos interpretado esta disposición para reconocer que en la vista preliminar el imputado tiene derecho a contrainterrogar los testigos presentados por el fiscal y presentar prueba de defensa para tratar de derrotar la probabilidad de que se cometió el delito imputado o la de que el imputado fue el autor de éste. Es decir, el imputado tiene derecho a demostrar lo contrario a lo que haya intentado probar el Ministerio Público. Pueblo v. Vélez Pumarejo, 113 D.P.R. 349 (1982). En la vista preliminar, hemos señalado antes, "el imputado tiene la oportunidad . . . de establecer que la imputación en su contra es injustificada o infundada." Pueblo v. Padilla Flores, supra, a la pág. 703.

A los fines de hacer viable que el imputado tenga la oportunidad referida de demostrar que la imputación en su contra es infundada, éste tiene un claro derecho en la vista preliminar a recibir las declaraciones juradas que tenga en su poder el Ministerio Público de

aquellos testigos que hayan declarado en dicha vista. Así lo dispone expresamente el inciso (c) de la Regla 23 de Procedimiento Criminal de Puerto Rico, 34 L.P.R.A. Ap. II, R.23(c). El propósito de ello, como lo hemos resuelto palmariamente antes, es que el imputado pueda **"estar en posición de impugnar la credibilidad del declarante durante esa misma vista [preliminar]."** Pueblo v. Rivera Rodríguez, Op. del 31 de marzo de 1995, ___ D.P.R. ___, 95 JTS 36. En Pueblo v. Rodríguez Aponte, supra, a la pág. 667, ya habíamos reconocido que el magistrado en la vista preliminar "puede apreciar la credibilidad de testigos." Recientemente, en Pueblo v. Andaluz Méndez, supra, precisamos el alcance de esta facultad del magistrado que preside la vista preliminar al indicar que éste puede:

> "descartar cualquier testimonio cuando, después de pasar juicio sobre el mismo a la luz de las demás circunstancias del caso y de la experiencia humana, razonablemente se convenza de que tal testimonio es inherentemente irreal o increíble o cuando el contenido del mismo, así analizado, es improbable; o **cuando dicho testimonio, por cualquier circunstancia, no es confiable o no goza de una razonable garantía de veracidad.** Después de todo, la evidencia para encauzar al imputado es suficiente únicamente cuando, además de sostener todos los elementos del delito, es susceptible de ser creída." (Enfasis suplido)

**En aras, pues, de evitar las acusaciones insustanciales, hemos reconocido claramente el derecho del imputado a demostrar en la vista preliminar que la credibilidad de los testigos de cargo es improbable.** Más aun, conscientes del peligro y la injusticia que apareja someter a una persona innecesariamente a un juicio criminal, Pueblo en Interés del Menor G.R.S., Op. de 6 de julio de 1999, ___ D.P.R. ___ 99 JTS 122, y de las gravosas consecuencias que ello conlleva tanto para el imputado como para el propio Estado, Del Toro Lugo v. E.L.A., supra, también hemos resuelto antes que en la vista preliminar el imputado puede presentar la **defensa de insanidad mental**, si puede demostrarla mediante evidencia clara y convincente. Pueblo v. Lebrón Lebrón, 116 D.P.R. 855 (1986); Hernández Ortega v. Tribunal Superior, 102 D.P.R. 765 (1974). Y, por razones similares, más recientemente hemos resuelto, además, que en la vista preliminar el imputado también puede presentar **la defensa de**

**coartada** si puede demostrarla mediante evidencia clara y convincente. Pueblo en Interés del Menor G.R.S., supra.

En resumen, pues, aunque el procedimiento de vista preliminar de la Regla 23 no persigue el propósito de establecer la culpabilidad o inocencia del imputado sino el de "averiguar mediante una vista adversativa si el Estado tiene suficiente prueba para continuar con el proceso judicial", Pueblo v. Rivera Rodríguez, supra, el imputado tiene un claro derecho en esa vista a contrainterrogar los testigos de cargo para impugnar su credibilidad y a presentar prueba de defensa "que derrote la probabilidad de su vinculación con el delito como autor del mismo." Id. Hemos insistido en que estos derechos del imputado, aunque no son irrestrictos, **no pueden tratarse livianamente**, **ni pueden limitarse de tal modo que queden truncos**. Pueblo v. Vega Rosario, supra. "Impedir que se presenten testigos a favor del imputado constituye una actuación arbitraria e irrazonable. El derecho a presentar prueba no es un mero formalismo." Id.

IV

Es menester señalar que en la jurisdicción federal, de donde procede nuestra Regla 23 de Procedimiento Criminal, se ha resuelto que en la vista preliminar el imputado tiene derecho a hacer todo lo posible para minimizar las probabilidades de que se concluya que existe causa probable. En particular, en una decisión federal, citada por este Tribunal recientemente en Pueblo de Puerto Rico en Interés del Menor G.R.S., supra, se señaló lo siguiente en relación a las funciones del magistrado y de la defensa en la vista preliminar:

> "The magistrate must listen to . . . the versions of all witnesses and observe their demeanor and **provide an opportunity to defense counsel to explore their account on cross-examination**. . . Among counsel's potential contributions. . . is skilled examination of witnesses which may expose fatal weaknesses in the prosecution's case that may lead the magistrate to refuse to bind the acussed over . . . The right to counsel . . . would amount to no more than a pious overture unless it is a **right to counsel able to function efficaciously in his client's behalf**. The Sixth

Amendment's guaranty of counsel is a pledge of **effective assistance by counsel**. . ." Coleman v. Burnett, 477 F 2d 1187, 1204-1205 (1973). (Enfasis suplido, citas omitidas).

En esa misma decisión federal también se señaló que:

"The traditional function of the preliminary hearing is a second determination on probable cause, this time after affording the accused **a reasonable opportunity to rebut it**. **Unless the accused is indulged in that respect**, the preliminary hearing is little more than a duplication of the probable cause decision that foreran his arrest." Id., pág. 1204, nota 96. (Enfasis suplido).

No puede haber duda, pues, de que en la jurisdicción federal, al amparo del derecho constitucional federal a representación legal adecuada, que se extiende incluso al procedimiento de vista preliminar, Coleman v. Alabama, 399 US 1 (1970), el imputado tiene derecho a realizar un contrainterrogatorio vigoroso de los testigos de cargo, lo que incluye el derecho a los medios necesarios para poder conducir tal contrainterrogatorio.

V

Reseñada la conocida normativa que rige el asunto que nos concierne aquí, pasemos ahora a aplicarla concretamente a la cuestión ante nuestra consideración en el caso de autos.

En Pueblo v. Padilla Flores, supra, a la pág. 703, expresamos que, como en la vista preliminar el imputado tenía la oportunidad de establecer que la imputación en su contra era injustificada o infundada, en consecuencia de ello era "imperativo que se le garanti[zara] una representación legal adecuada y eficaz". De igual modo, por la misma innegable lógica jurídica, es evidente que como el imputado tiene la oportunidad en la vista preliminar de **demostrar que el testimonio en su contra no es susceptible de ser creído**, en consecuencia de ello tiene también el derecho a obtener aquella prueba que lo haga posible. Ello incluye necesariamente el derecho a recibir aquellos documentos pertinentes o afines al referido derecho del imputado que el Ministerio Público tenga en su poder. Frente al claro derecho de contrainterrogar del imputado, da lo mismo que las declaraciones de los testigos de cargo en manos del Ministerio Público sean juradas o no. Véase, Pueblo v. Delgado, 106 D.P.R 441 (1977). Si el imputado no tuviese el derecho de recibir los documentos referidos, sería hueca e inconsecuente la oportunidad que reiteradamente le hemos reconocido en la vista preliminar para contrainterrogar los testigos de cargo y demostrar que su testimonio no es susceptible de ser creído.

Nótese que no se trata de un derecho irrestricto de descubrimiento de prueba. No estamos reconociendo un derecho a una "expedición de pesca" en los archivos de fiscalía. En esta temprana etapa del proceso criminal el imputado sólo tiene derecho a demostrar que es improbable que se haya cometido el delito imputado o que él sea el autor de éste. Por ende, además de las declaraciones juradas de los testigos usados por fiscalía, sólo puede tener acceso a aquella otra prueba en manos del Ministerio Público que razonablemente

tendería a demostrar, que el testimonio en contra del imputado "no es confiable o no goza de una razonable garantía de veracidad". Pueblo v. Andaluz Méndez, supra. No se trata, por ejemplo, de prueba que tenga fiscalía sobre simples contradicciones de los testigos de cargo sino de aquella prueba de calidad suficiente como para derrotar la estimación de causa probable para acusar. Véase, Pueblo v. Rodríguez Aponte, supra, a la pág. 669.

Los informes y la grabación que aquí nos conciernen, vistos en conjunto a la luz de las circunstancias particulares de éste caso, ciertamente constituían el tipo de prueba que el Ministerio Público debió haber puesto a disposición del imputado, para que éste tuviese una oportunidad **real y efectiva** de contrainterrogar a Santana Báez y de demostrar que su testimonio no era susceptible de ser creído. Se trataba de prueba que claramente podía conducir a una determinación judicial de que la credibilidad del testigo de cargo era improbable. Varias condiciones confluyen para hacer esta conclusión ineludible. Veamos.

En primer lugar, debe notarse que Santana Báez, **único testigo del Estado en este caso**, no es el tipo de persona cuyo testimonio de ordinario provoca o inspira confiabilidad fácilmente. Se trata de un delincuente consuetudinario, **dado a mentir**, cuyas declaraciones deben sopesarse con mucho cuidado.

En segundo lugar, se trata de un testigo que ha cambiado su versión de los hechos **varias veces antes de comparecer a la vista preliminar**. Debe recordarse que Santana Báez primero alegó no haber presenciado los hechos en cuestión, luego adujo que sí había participado en el secuestro, y más tarde retomó su versión original, todo ello **antes** de sentarse a declarar en la vista preliminar.

En tercer lugar, se trata de un testigo que en más de una ocasión antes de la vista preliminar ha insistido en que fue **presionado por agentes del orden público** a dar la versión de los hechos sostenida por el Ministerio Público. No tenemos aquí la situación de un testigo

potencial que sólo por estar renuente a inmiscuirse en un proceso criminal hace manifestaciones inconsistentes, o la de uno que sólo por intereses particulares emite tales declaraciones. Tenemos más bien la situación mucho más preocupante en la cual se ha alegado, en efecto, la fabricación de prueba por agentes policíacos, conducta que es absolutamente intolerable en un régimen de derecho. Se trata, en otras palabras, de una alegación de tal gravedad, que amerita eficaz esclarecimiento judicial.

Finalmente, debe notarse que las manifestaciones que aquí nos conciernen, hechas en **tres ocasiones distintas** por Santana Báez antes de la vista preliminar, pueden tener el efecto de **destruir totalmente la determinación de causa probable** que se hizo en este caso.

A la luz de lo anterior, en un caso como el de autos, constituiría un claro fracaso de la justicia no permitirle a la defensa del imputado contrainterrogar a fondo al testigo del Ministerio Público sobre sus diversas versiones de los hechos, y encararlo con la inconsistencia de su declaración en la vista preliminar respecto a algunas de sus manifestaciones anteriores y así tratar de establecer su mendacidad. La vista preliminar que se celebre en un caso como el de autos, sin que el imputado pueda ejercer **eficazmente** el limitado derecho a defenderse que le asiste, constituye una desnaturalización de este procedimiento. Debido a la falta de divulgación por parte del Ministerio Público de la prueba pertinente referida, el magistrado que preside la vista no puede realizar propiamente su función de "ponderar debidamente la prueba y determinar que existen suficientes fundamentos para justificar un procedimiento criminal". Pueblo v. Vallone, supra. Para todos los efectos prácticos, en casos como el de autos, la vista preliminar pierde el carácter adversativo que consagra la Regla 23 de Procedimiento Penal y se convierte en una mera rutina o un mero formalismo, al no tener el imputado una oportunidad **real** de refutar la evidencia que el Estado presenta en dicha vista. No se logra de manera auténtica o verdadera

el "filtro o cedazo judicial por el cual el Estado tiene que pasar su prueba y demostrar si está justificado o no intervenir con la libertad de un ciudadano y someterlo a los rigores y contingencias de un juicio plenario". Pueblo v. Rodríguez Aponte, supra, a la pág. 665.

VI

Hay algo más que también debemos considerar en el análisis de la cuestión ante nos. En su fondo, el asunto que aquí nos concierne no es meramente uno de interpretar la Regla 23 de Procedimiento Criminal, o de dilucidar unos conceptos mínimos de garantía constitucional. En su substrato más profundo, la controversia que nos ocupa hoy gira en torno a la naturaleza misma de nuestro sistema de justicia criminal.

En incontables ocasiones hemos resuelto que "el objetivo de **todo** procedimiento judicial es el esclarecimiento de la verdad". Pueblo v. Vega Rosario, supra; Pueblo v. Arreche Holdun, 114 D.P.R. 99, 115 (1983); Pueblo v. Cancel Hernández, 111 D.P.R. 625, 626-627 (1981); Pueblo v. Delgado López, 106 D.P.R. 441 (1977); Pueblo v. Quiñones Ramos, 99 D.P.R. 1 (1970); Pueblo v. Díaz Díaz, 86 D.P.R. 558 (1962); Pueblo v. Ribas, 83 D.P.R. 386 (1961); Pueblo v. Tribunal Superior, 80 D.P.R. 702 (1958). Este concepto fundamental, que lo hemos invocado reiteradamente en referencia precisamente a todo el **proceso criminal**, se origina en nuestra honda convicción de que "sólo se hace justicia cuando se conoce toda la verdad", Pueblo v. Ribas, supra, a la pág. 389; y de que los tribunales existen "para derribar obstáculos en el camino hacia lo justo". Pérez Cruz v. Fernández, 101 D.P.R. 365, 377 (1973). Expresamos esta honda convicción en Pueblo v. Quiñones Ramos, supra, a la pág. 3, al reiterar "que el propósito del proceso criminal es descubrir la verdad para poder hacer verdadera justicia".

El corolario indiscutible del principio fundamental referido es que "el interés principal del Estado en una causa criminal no es ganar un caso sino que se haga justicia". Pueblo v. Delgado López, supra, a la pág. 444. Por ello hemos insistido en que el Estado no tiene

interés legítimo "en interponer obstáculos para que se conozcan todos los hechos y pueda descubrirse la verdad." Pueblo v. Díaz Díaz, supra, a la pág. 561; y Pueblo v. Ribas, supra, a la pág. 389.

Una y otra vez hemos insistido en que los procesos judiciales **no** son competencias en las cuales ha de prevalecer el más listo. Pueblo v. Vega Rosario, supra; Pueblo v. Arreche Holdun, supra, a la pág. 115. Más bien, la meta final de todo proceso judicial, incluyendo la vista preliminar, es que "siempre se haga la mejor justicia que nosotros los seres humanos somos capaces" fundamentado ello sobre el esclarecimiento de la verdad. Id. El celo por encauzar al criminal, sobre todo cuando lo motiva además, el interés por quedar bien ante la opinión pública, no justifica nunca la utilización de medios contrarios a la meta reseñada.

A la luz de estos medulares conceptos, es evidente que, al menos en casos como el de autos, la omisión del Ministerio Público en no poner a la disposición del imputado la prueba pertinente en su poder sobre manifestaciones adversas de su único testigo de cargo, no es cónsona con la naturaleza esencial de nuestro sistema de justicia criminal, que preconiza la búsqueda de la verdad como principio fundamental que permea todo procedimiento judicial.

VII

Resolvemos, pues, que en el caso de autos el Ministerio Público tenía el deber de entregarle a los peticionarios copias de los informes referidos y de la cinta de grabación, con antelación suficiente para que éstos pudiesen ejercitar efectivamente su derecho a contrainterrogar al testigo de cargo.

Con este dictamen no expresamos juicio definitivo alguno sobre la credibilidad del testigo Santana Báez. No nos corresponde hacerlo aquí. Ello le compete primordialmente al magistrado que preside la vista preliminar, que es quien está en mejor posición de juzgar, luego del                                                  correspondiente

contrainterrogatorio, si su testimonio es susceptible de ser creído. Sin que se haya realizado el contrainterrogatorio eficaz a que tenían derecho los peticionarios, no puede hacerse determinación válida alguna sobre este asunto. Por eso, erró el foro apelativo al estimar a priori que el magistrado de la vista preliminar en este caso no hubiese variado su determinación de causa probable de haber tenido la oportunidad de evaluar todos los testimonios de Santana Báez. No le competía a ese foro, ni a nosotros, prejuzgar tal cuestión.[1]

## VIII

Por los fundamentos expuestos, debe expedirse el auto solicitado, dejarse sin efecto los dictámenes referidos del foro de instancia y del foro apelativo, y devolver el caso al foro de instancia para celebrar nuevamente la vista preliminar, conforme a lo aquí resuelto.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

---

[1] Debe quedar claro, además, que en la vista referida el ministerio público tendrá derecho a presentar aquella prueba, admisible en evidencia, que pueda tener en su poder para explicar o justificar la inconsistencia de su testigo entre lo declarado en la vista preliminar y las declaraciones anteriores suyas, a los fines de establecer que la declaración del testigo en la vista preliminar probablemente sea cierta.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido


       v.                        CC-1999-297      Certiorari

José L. Ortiz Vega y
Eugenio J. Rodríguez Galindo

    Acusados y Peticionarios


SENTENCIA


San Juan, Puerto Rico, a 8 de octubre de 1999.


      Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente sentencia, se expide el auto solicitado, se deja sin efecto los dictámenes del foro de instancia y del foro apelativo, y se devuelve el caso al foro de instancia para celebrar nuevamente la vista preliminar, conforme a lo aquí resuelto.

      Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López emitió Opinión de Conformidad. El Juez Asociado señor Negrón García emitió Opinión Disidente, a la que se une el Juez Asociado señor Corrada del Río. El Juez Asociado señor Hernández Denton emitió Opinión Disidente.


                        Isabel Llompart Zeno
                  Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Recurrido

       vs.                       CC-99-297        CERTIORARI

José L. Ortiz Vega
Eugenio J. Rodríguez Galindo

    Acusados-peticionarios



**OPINIÓN DE CONFORMIDAD EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ**

**San Juan, Puerto Rico, a 8 de octubre de 1999**


Expresó, en una ocasión, don José Ortega y Gasset que el hombre es "él y sus circunstancias" y que éste piensa, razona y actúa conforme a las mismas. Estas sabias expresiones del gran filósofo español curiosamente son aplicables, de cierta manera, al caso que hoy ocupa nuestra atención. Conocida resulta ser la trillada norma jurisprudencial a los efectos de que los jueces tenemos la obligación de resolver los casos que son traídos ante nuestra consideración conforme a sus particulares hechos y circunstancias.

Los hechos específicos del presente caso nos brindan la oportunidad --la que a nuestro juicio no aprovechamos totalmente-- de actuar y descargar la

grave responsabilidad que tenemos como máximo foro judicial del País, esto es, de establecer una norma que no solo regule la situación fáctica del presente caso sino que evite, hasta donde ello sea posible, la repetición en nuestra jurisdicción de la situación intolerable que sirve de base al recurso que hoy resolvemos.

Hemos entendido necesario expresarnos por separado con el propósito de dejar constancia de la existencia de fundamentos adicionales, a los expresados en la Opinión mayoritaria, en apoyo de la decisión emitida y de nuestra creencia que, ante la conducta observada en el presente caso por los representantes del Departamento de Justicia de Puerto Rico, el Tribunal pudo, incluso, tomar un curso de acción decisorio más drástico.

I

Los hechos del presente caso son unos ciertamente lamentables. Se originan los mismos con la desgraciada e irreparable pérdida de la vida de una niñita, acaecida la misma en el área recreativa del Escambrón, San Juan, Puerto Rico, el día 8 de junio de 1997. El infortunado deceso se convirtió en una causa célebre, emitiendo la Policía de Puerto Rico boletines de prensa diarios, los cuales, en ocasiones, resultaban contradictorios.

Luego de haber sido informada la ciudadanía puertorriqueña, a lo largo de varios meses, de la existencia de varios sospechosos, o responsables, de la alegada muerte criminal de la niña, el Secretario de Justicia y el Superintendente de la Policía de Puerto Rico, acompañados éstos por directivos del Negociado Federal de Investigaciones (F.B.I.), sorpresivamente informaron al País que, después de todo, la muerte de la niña no había sido un crimen y sí un lamentable accidente; expresando, en apoyo de dicha conclusión, que el joven hermanito de la occisa había sido testigo de ello. En consecuencia, se decretó el archivo y sobreseimiento administrativo del caso.

Esa percepción, u opinión, de los principales funcionarios encargados de la investigación y el esclarecimiento de alegados actos delictivos en nuestro País, no tuvo una larga duración. Días más tarde, el Secretario de Justicia, en otra conferencia de prensa, le informó a nuestra ciudadanía que, después de todo, la muerte de la infortunada niñita no había sido un accidente, esto es, que había sido un acto criminal y que el responsable del mismo lo era un menor de edad. A pesar de que no se identificó al menor por su nombre, se dio a entender que era el hermanito de la occisa.

Dicha situación tampoco prevaleció por mucho tiempo. Nuevamente haciendo uso de los medios de publicidad, y con gran fanfarria, los mismos funcionarios que anteriormente nos habían informado, en primer lugar, que se trataba de un accidente, y luego, de un acto criminal del cual era responsable un menor de edad, nos informaron que lo que había acontecido en realidad había sido un repugnante crimen, cometido por venganza, en el cual los perpetradores del mismo habían incurrido, incluso, en el delito de violación contra la pequeña niña.

La razón para este sorpresivo cambio de posición de parte, repetimos, de los principales funcionarios encargados de la investigación de los crímenes y el procesamiento de los responsables de los mismos en nuestra jurisdicción, lo fue la aparición en escena de un supuesto testigo presencial de los hechos delictivos cometidos de nombre Eliezer Santana Báez, conocido por "mala muerte"; persona que había prestado una declaración jurada en la cual inculpaba a los aquí acusados peticionarios José L. Ortiz Vega y Eugenio J. Rodríguez Galindo.

A base del testimonio del mencionado testigo, se determinó causa probable para arresto y causa probable para acusar en la vista preliminar, contra los aquí peticionarios; huelga decir que el testimonio de "mala muerte" es el único que involucra a los peticionarios con la comisión del crimen.

Radicados los correspondientes pliegos acusatorios por los delitos de Secuestro, violación a la Ley de Armas, y el delito de Asesinato en Primer Grado, los peticionarios radicaron una moción, al amparo de las disposiciones del Inciso (p) de la Regla 64 de las de Procedimiento

Criminal.

El principal fundamento de los peticionarios, en apoyo de la antes mencionada contención, es que el testigo conocido como "mala muerte" había hecho, en varias ocasiones, manifestaciones a los efectos de que él no había presenciado la ocurrencia de los hechos, contradiciendo así lo que había expresado en la declaración jurada que había prestado ante un fiscal, y, además, que agentes de la Policía de Puerto Rico lo habían inducido a mentir en ese respecto. Sostuvieron los peticionarios que no habiéndole entregado el ministerio fiscal la evidencia de dichas declaraciones contradictorias en la vista preliminar, su derecho a contrainterrogar a dicho testigo de manera eficaz e informada se vio afectado en la referida vista; razón por la cual el tribunal venía en la obligación de desestimar las acusaciones radicadas bajo las disposiciones de la citada Regla 64(p) de Procedimiento Criminal, por no haber sido la determinación de causa probable hecha conforme a derecho.

El foro de instancia <u>denegó</u> dicha solicitud. El Tribunal de Circuito de Apelaciones <u>confirmó</u> la referida denegatoria. Inconforme, acudieron ante este Tribunal los peticionarios, imputándole error a dichos foros judiciales al así decidir. Emitimos orden de mostrar causa. El Estado ha comparecido en cumplimiento de la misma. Hoy una mayoría de los integrantes del Tribunal entiende que procede la revocación del dictamen del tribunal apelativo intermedio; esto es, se determina que procede decretar la desestimación de las acusaciones radicadas y se resuelve que lo procedente es devolver el caso al tribunal de instancia para la celebración de una nueva vista preliminar.

En apoyo de su determinación, el Tribunal sostiene, en síntesis y en lo pertinente, que resulta procedente así actuar en vista del hecho que: la evidencia en controversia es una de carácter exculpatoria; la conducta en que incurrió el ministerio fiscal infringe el derecho que tiene todo imputado de delito a contrainterrogar un testigo, en forma informada, en la vista preliminar; la misma privó a los peticionarios de su derecho a impugnar la credibilidad de dicho testigo; y que dicha conducta no es cónsona con el objetivo de todo procedimiento judicial, cual es el esclarecimiento de la verdad y el procurar que se haga justicia.

A pesar del hecho de que somos del criterio que el Tribunal debería -- como curso de acción ejemplarizante, ante la conducta irregular observada por el Departamento de Justicia de Puerto Rico en el presente caso-- <u>desestimar y archivar</u> los cargos pendientes, nos <u>allanamos</u> a que se deje sin efecto la determinación de causa probable para acusar y que se devuelva el caso al tribunal de instancia para la celebración de una nueva vista preliminar. <u>Adoptamos este curso decisorio en aras de colegiar y con el propósito de que el Tribunal pueda emitir una sentencia con un resultado sensato y no absurdo.</u>[2]

II

Atendemos, en primer lugar, la interrogante sobre el "carácter" de la evidencia que el Estado <u>no</u> le proveyó a la defensa de los peticionarios a nivel de vista preliminar, relativa la misma a las declaraciones hechas por el testigo de cargo Santana Báez en las que se retracta de la declaración jurada que prestara ante el fiscal. Conforme lo resuelto en <u>Pueblo</u> v. <u>Echevarría Rodríguez</u>, 128 D.P.R. 299, 333 (1991), <u>no hay la menor duda del hecho de que dicha evidencia es una de carácter exculpatorio</u>.

En el antes citado caso de <u>Echevarría Rodríguez</u>, este Tribunal expresó, en lo pertinente, que:

"......'Evidencia exculpatoria' es <u>toda</u> aquella que <u>resulta</u>

---

[2] **De no hacerlo, el resultado absurdo al que se llegaría sería que no habría votos suficientes para dejar sin efecto la determinación de causa probable para acusar, ya que habría un empate; situación que causaría que prevaleciera la errónea y defectuosa determinación de causa probable que se hiciera a nivel de instancia, situación que es intolerable e improcedente en derecho.**

favorable al acusado y que posee relevancia en cuanto a los aspectos de culpabilidad y castigo, irrespectivamente de la buena o mala fe exhibida por el Ministerio Fiscal. [Citas omitidas.] La 'relevancia' de la evidencia se encuentra condicionada a la impresión derivada por el foro apelativo de que la prueba exculpatoria suprimida, con una razonable probabilidad, habría alterado el veredicto o el castigo impuesto de haber sido presentada al juzgador de los hechos. [Citas omitidas.] ..." (Enfasis suplido.)

Conforme las expresiones antes transcritas, repetimos, no cabe duda de que la evidencia "suprimida" por el Estado, a nivel de vista preliminar, efectivamente constituye "evidencia exculpatoria". La misma, no hay duda, favorece o beneficia a los peticionarios. Por otro lado, tampoco albergamos duda de que dicha evidencia es "relevante"; dicha evidencia, en nuestra opinión o "impresión", podría haber cambiado la determinación de causa probable que se hizo a nivel de vista preliminar.

Sobre este asunto, realmente, no hay controversia. El Estado en su comparecencia ante este Tribunal, en cumplimiento de la orden de mostrar causa que emitiéramos, acepta que esta evidencia es de carácter exculpatorio. Su argumento es otro. Sostiene el Procurador General de Puerto Rico --teoría que es avalada por dos compañeros Jueces-- que el Estado venía en la obligación de revelar dicha evidencia, y entregarla a la defensa, luego de que se hubieren radicado las correspondientes acusaciones, pero no antes. Conforme expone el Procurador General, ello así surge de las disposiciones del Inciso (a) de la Regla 95 de las de Procedimiento Criminal. No tiene razón.[3]

---

[3] **El Inciso (a) de la Regla 95 establece que:**

**"(a) Previa moción del acusado sometida en cualquier momento después de haberse presentado la acusación o denuncia, y dentro del término prescrito para someterla, el tribunal ordenará al Ministerio Fiscal que permita al acusado inspeccionar, copiar o fotocopiar el siguiente material o información que está en posesión, custodia o control del Ministerio Fiscal:**

**(1) Cualquier declaración jurada que el Ministerio Fiscal tenga del acusado.**
**(2) Cualquier declaración jurada de los testigos de cargo que hayan declarado en la vista para determinación de causa probable para el arresto o citación, en la vista preliminar, en el juicio o que fueron renunciados por el Ministerio Fiscal y los récords de convicciones criminales previas de éstos.**
**(3) Cualquier resultado o informe de exámenes físicos o mentales y de experimentos o pruebas científicas que sea relevante para preparar adecuadamente la defensa del acusado o que vaya a ser utilizado en el juicio por el Ministerio Fiscal.**
**(4) Cualquier libro, papel, documento, fotografía, objeto tangible, estructura o lugar que sea relevante para preparar adecuadamente la defensa del acusado, que el Ministerio Fiscal se propone utilizar en el juicio o que fue obtenido del acusado o perteneciera al acusado.**
**(5) El récord de convicciones criminales previas del acusado.**
**(6) Cualquier informe preparado por agentes de la Policía en relación con las causas seguidas contra el acusado que sea relevante para preparar adecuadamente la defensa del acusado. El descubrimiento de esta prueba estará sujeto a las siguientes condiciones:**
**(A) Que los objetos, libros, documentos y papeles que el**

El argumento a esos efectos del Procurador General pasa por alto el sencillo hecho de que la citada Regla 95 de Procedimiento Criminal contiene otros tres (3) incisos que son completamente separados y distintos del Inciso (a), a saber, los Incisos (b), (c) y (d).[4] Un somero examen de los Incisos (a) y (b) demuestra una enorme y trascendental diferencia entre los mismos, a saber: el Inciso (a) exige, como requisitos para que el Estado venga en la obligación de permitir que la defensa pueda "inspeccionar, copiar o fotocopiar..." la evidencia allí enumerada, que el acusado radique una moción a esos efectos "...en cualquier momento después de haberse presentado la acusación o denuncias, ...".

El citado Inciso (b) de la Regla 95 no contiene ni exige ninguno de esos requisitos. Dicho Inciso (b) sencillamente establece que el "...Ministerio Público revelará toda aquella evidencia exculpatoria del acusado que tenga en su poder". Al buen entendedor, con pocas palabras basta.

¡Y es que no puede ser de otra forma! El derecho del acusado a que se le informe, o revele, la prueba exculpatoria en poder del fiscal surge como un imperativo del debido proceso de ley. Véase: Pueblo v. Hernández García, 102 D.P.R. 506 (1974); Pueblo v. Rodríguez Sánchez, 109 D.P.R. 243 (1979); Pueblo v. Romero Rodríguez, 112 D.P.R. 437 (1982). La esencia del asunto es la depuración de hechos en la búsqueda de la verdad y la responsabilidad del Estado de proveer un juicio justo. Pueblo v. Rodríguez Sánchez, ante. Véase, además, Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Forum, 1992, Vol. II, págs. 28 y ss.

Hemos expresado que la naturaleza del debido proceso de ley es una eminentemente flexible y pragmática. Pueblo v. Andréu González, 105 D.P.R. 315, 320 (1976). Como consecuencia de su pragmatismo, la prohibición contra la privación de la libertad sin el debido proceso de ley entraña un fino balance entre el interés legítimo del Estado, al intervenir con el ciudadano en la persecución del crimen, y la extensión de los derechos constitucionales ciudadanos frente al ejercicio del poder de razón del Estado. Como acertadamente señala la Profesora Resumil "[l]a doctrina que surge de su interpretación, ..., tiene el efecto de garantizar la aplicación de los derechos concedidos en la Constitución, permitiendo su extensión aun a procedimientos para los cuales no fueron

---

acusado interesa examinar se relacionan o describen con suficiente especificación;

(B) que no afecte la seguridad del estado ni las labores investigativas de sus agentes policíacos, y

(C) que la correspondiente moción del acusado sea presentada con suficiente antelación a la fecha señalada para la celebración del juicio, de manera que no haya innecesarias dilaciones en los procedimientos ni se produzcan molestias indebidas a los funcionarios del Estado." (Enfasis suplido.)

[4] Los Incisos (b), (c) y (d) de la Regla 95 establecen:

"(b) El Ministerio Fiscal revelará toda aquella evidencia exculpatoria del acusado que tenga en su poder.

(c) El Ministerio Fiscal deberá informar al tribunal si el material o la información solicitada no se encuentra en su posesión, custodia o control, en cuyo caso el tribunal ordenará a la persona o entidad que la posea, custodie o controle, que la ponga a la disposición del acusado.

(d) No estarán sujetos a descubrimiento o inspección de la defensa los escritos de investigación legal, informes, memorandos, correspondencia u otros documentos internos que contengan opiniones, teorías o conclusiones del Ministerio Fiscal." (Enfasis suplido.)

diseñados".[5]

Debe quedar claro: ocurre una violación al debido proceso de ley cuando el brazo acusador del Estado priva a un imputado de delito de información o evidencia que es favorable, beneficiosa o exculpatoria para éste. Brady v. Maryland, 373 U.S. 83 (1963). Ello es así, independientemente de la buena o mala fe del Estado al así actuar. Moore v. Illinois, 408 U.S. 786 (1972).

Establecido lo anterior, nos enfrentamos a la segunda interrogante: ¿cuándo es que surge la obligación, de parte del Estado, de entregar tal prueba al acusado? En nuestro criterio, la contestación es sencilla: inmediatamente que el Estado adviene en conocimiento o posesión de la referida evidencia. Veamos.

Aparte del argumento antes esbozado --a los efectos de que el Inciso (b) de la citada Regla 95 no establece requisito de que la obligación de entregar la prueba exculpatoria sea con posterioridad a ser radicada la acusación-- la mera idea de que el fiscal no viene en la obligación de entregar dicha prueba, digamos, en la etapa de vista preliminar, nos parece repugnante.

Reiteradamente hemos resuelto que el derecho al descubrimiento de prueba es uno consustancial con el derecho a todo acusado a defenderse en un proceso criminal en su contra. Pueblo v. Arocho Soto, res. el 29 de diciembre de 1994, 137 D.P.R. (1994). ¿Acaso en vista preliminar el imputado no tiene derecho a defenderse?

Hemos resuelto que al "...permitir que el imputado [de delito] presente prueba a su favor en la vista preliminar, éste tiene al menos dos herramientas: (1) ataca la probabilidad de que, en efecto, se haya infringido la ley, esto es, la existencia misma del delito imputado, y/o (2) demuestra que es menos probable que él haya cometido el delito; probabilidades alrededor de las cuales, precisamente, gira la determinación de causa probable para acusar". (Enfasis suplido y en el original.) Pueblo v. Vega Rosario, res. el 1$^{ro.}$ de julio de 1999, 99 TSPR 112.

No hay duda de que la prueba aquí en controversia, la cual el Estado no le brindó a la defensa, versa sobre tales elementos. Hemos descrito la vista preliminar como el "umbral del debido proceso de ley". Pueblo v. Vega Rosario, ante. ¿Cómo es posible que alguien se atreva a argumentar que el acusado no tiene derecho a contar con prueba que demuestre su inocencia en el "umbral del debido proceso de ley"?

Pero, hay más. El Estado, en el presente caso, no sólo tenía la obligación de informarle y entregarle a la defensa la evidencia con que contaba relativa a las manifestaciones y/o declaraciones contradictorias que había hecho el testigo "mala muerte", sino que también venía en la obligación, sua sponte, de entregarle a la defensa la prueba que le sirvió de base al Secretario de Justicia para determinar, en un momento dado, que lo ocurrido había sido un accidente y la que éste utilizó como fundamento para, posteriormente, expresar públicamente que el responsable de la muerte había sido un menor de edad.

No tenemos duda en nuestra mente que esa evidencia tiene que existir y que está bajo la posesión y control del Departamento de Justicia de Puerto Rico. No podemos concebir que el Secretario de Justicia y el Superintendente de la Policía de Puerto Rico hubieran hecho tales manifestaciones públicas sin contar con alguna evidencia que sustentara sus expresiones.

En relación a ello, este Tribunal ha resuelto que se infringe el debido proceso de ley no sólo cuando el estado no revela prueba exculpatoria a solicitud de la defensa sino que cuando "...aun sin solicitud de la defensa, el Ministerio Fiscal no revela a la defensa evidencia que sabía, o debió haber sabido, que era favorable a la defensa". Pueblo v. Hernández García, 102 D.P.R. 506, 509-510 (1974); Pueblo v. Cancel

_____

[5] **Resumil de Sanfilippo O.E., Derecho Procesal Penal, 1990, Equity, New Hampshire, T. I, pág. 26.**

Hernández, 111 D.P.R. 625, 628 (1981); Chiesa Aponte, E.L., op. cit., pág. 315.

No albergamos duda alguna, repetimos, de que la prueba en poder del Departamento de Justicia, la cual sirvió de base a las expresiones del Secretario, benefician o favorecen a los peticionarios. La prueba respecto a que lo ocurrido fue un accidente es de suma importancia para la defensa pues, incluso, le permite atacar "...la probabilidad de que, en efecto, se haya infringido la ley, esto es la existencia misma del delito imputado..." (Énfasis suplido.) Pueblo v. Vega Rosario, ante.

Por otro lado, en la segunda conferencia de prensa celebrada por el Secretario de Justicia, éste señaló a un menor de edad como responsable de los hechos. La prueba en que basó dicha afirmación el Secretario obviamente puede ser utilizada por los aquí peticionarios, en la vista preliminar, para demostrar "...que es menos probable que [ellos hayan] cometido el delito..." Pueblo v. Vega Rosario, ante.

En resumen, en nuestra opinión la defensa de los aquí peticionarios no sólo tiene derecho a que el Estado le suministre, a nivel de vista preliminar, la evidencia sobre las declaraciones que contradicen su declaración jurada sino que, además, tiene derecho a que se les entregue la prueba en poder del Departamento de Justicia que sirvió de base para las manifestaciones que hiciera el Secretario de Justicia de que lo ocurrido había sido un accidente y, posteriormente, que el responsable de los hechos lo era un menor de edad; ello por imperativo del debido proceso de ley.

### III

Ante esta situación, ¿cuál debería de ser el curso decisorio a seguir? Como hemos señalado, el Tribunal entiende procedente desestimar las acusaciones radicadas, al amparo de las disposiciones del Inciso (p) de la Regla 64 de las de Procedimiento Criminal, y devolver el caso al foro de instancia para la celebración de una nueva vista preliminar.

Aun cuando estamos de acuerdo con que se decrete la desestimación de los cargos, diferimos un tanto de la determinación a los efectos de que lo procedente es devolver el caso a instancia para la celebración de una nueva vista preliminar. En nuestro criterio, lo que procede decretar es el archivo y sobreseimiento definitivo de los cargos radicados contra los aquí peticionarios. Veamos porqué.

La conducta en que incurrieron, en el presente caso, los representantes del ministerio fiscal es una ciertamente seria y grave, la cual, a nuestro juicio, amerita que se tome por este Tribunal, en protección de la ciudadanía, una acción drástica y ejemplarizante; ello con el propósito de que una situación como ésta no vuelva a repetirse en nuestra jurisdicción.

Aquí, como hemos visto, están envueltas dos (2) clases de evidencia exculpatoria. La primera de ellas es la relativa a la prueba que le sirvió de base al Secretario de Justicia de Puerto Rico para, en primer lugar, determinar que lo ocurrido había sido un accidente y, en segundo lugar, para posteriormente determinar que el responsable del acto criminal cometido lo era un menor de edad.

Como señaláramos anteriormente, dicha evidencia beneficiaba y favorecía a los peticionarios por cuanto la misma le permitía no sólo atacar la existencia misma del delito --por cuanto lo que había ocurrido, conforme el Secretario de Justicia, era un accidente-- sino que le permitía a éstos demostrar que era menos probable, de lo ocurrido constituir un acto criminal, que ellos eran responsables del mismo. La actuación del Estado, suprimiendo esta evidencia, sería suficiente, por sí sola, para ordenar la desestimación de los pliegos acusatorios radicados.

Pero, hay más. La conducta verdaderamente repugnante y grave de parte de los representantes del ministerio fiscal se refiere a la otra evidencia exculpatoria suprimida; esto es, a las declaraciones del testigo "mala muerte", mediante las cuales éste se retracta de la declaración jurada que prestara ante un fiscal.

Recordemos que este testigo es el único que involucra a los aquí

peticionarios. No podemos olvidar, por otro lado, que es un testigo que no tiene mucha credibilidad ni "credenciales" de persona decente y respetuosa de la ley y el orden público.

Es por ello que las declaraciones contradictorias que, respecto a este testigo, suprimió el Estado son "algo más" que meras declaraciones exculpatorias. Las mismas destruyen totalmente la única prueba con que cuenta el ministerio fiscal contra los aquí peticionarios.

En otras palabras, los funcionarios del ministerio fiscal que intervinieron en la supresión de esta evidencia sometieron, de manera intencional, a los aquí peticionarios a los rigores de un proceso criminal a sabiendas de que el único testimonio que involucraba a estas dos personas era un testimonio, cuando menos, perjuro y carente el mismo de toda posible credibilidad. Esta acción, la cual a nuestro entender va más allá de negligencia crasa en el desempeño de sus cargos[6], realmente amerita "algo más" que la mera desestimación de las acusaciones radicadas y la celebración de una nueva vista preliminar.

En otras palabras, la conducta ambivalente en que han incurrido los representantes del Departamento de Justicia de Puerto Rico en el presente caso no debe ni puede ser tolerada. Los funcionarios involucrados en el mismo deben de aprender que así no se actúa cuando está en juego la libertad y la reputación de nuestros ciudadanos.

Los encargados de la investigación y esclarecimiento de alegados hechos delictivos en nuestro País, antes de radicar cargos criminales contra los ciudadanos, tienen el deber de asegurarse, hasta donde ello sea posible, que su determinación a esos efectos es el producto de una investigación seria y responsable. Nosotros por lo menos, no estamos en disposición de tolerar conducta como la observada en el presente caso.

Debe mantenerse presente lo dispuesto en el Preámbulo del Código de Etica a los efectos de que "...en Puerto Rico, donde el sistema democrático es fundamental para la vida de la comunidad y donde la fe en la justicia se considera factor determinante en la convivencia social, es de primordial importancia instituir y mantener un orden jurídico íntegro y eficaz, que goce de la completa confianza y apoyo de la ciudadanía". Flaco servicio se hace al pueblo puertorriqueño si se permite que los fiscales utilicen la maquinaria del Estado en contra de los ciudadanos, mientras le esconden a éstos herramientas básicas para su eficaz defensa; todo esto en aras de poder conseguir una determinación de causa probable que no solo sobrecarga innecesariamente las labores de los tribunales del País, sino que somete el ciudadano a los sinsabores que acarrea el tener que defenderse ante el foro judicial y le pone en riesgo de ser encarcelado y privado de su libertad, lo cual constituye uno de los más severos castigos al que puede ser sometido un ser humano.

Somos del criterio que la única forma de evitar esta clase de situación –

---

[6] El Canon 5 de los Cánones de Etica Profesional establece que "...es el deber del abogado defensor y del fiscal procurar que se haga justicia. ... La supresión de hechos o la ocultación de testigos capaces de establecer la inocencia del acusado es altamente reprochable."

Hemos expresado que, aun cuando el fiscal tiene una función distinta a la de un abogado defensor, esta diferencia en funciones "...nunca debe obscurecer la verdad básica de que, aunque sus papeles son distintos, cada uno está atado por el Código de Etica Profesional y una tradición de buena conducta." In re: Colton Fontán, 128 D.P.R. 1 (1991).

En el antes citado caso de Colton Fontán, establecimos claramente que "...incurre en conducta impropia el Fiscal que, en una investigación criminal, por negligencia crasa ignora y en ocasiones tergiversa u oculta evidencia que hubiera esclarecido los hechos investigados."

—esto es, conducta irresponsable e impropia de parte del ministerio fiscal-- lo es mediante el establecimiento de una norma que conlleve la desestimación, con perjuicio, de los cargos que, bajo estas circunstancias, radique el Estado ante el foro judicial.

Es posible que el establecimiento de dicha norma, en algún caso, tenga la desafortunada consecuencia de que el culpable de unos hechos delictivos no reciba su merecido castigo. Si bien ello podría suceder, la referida norma tendrá la saludable consecuencia, por otro lado, de evitar que cientos de nuestros conciudadanos sean sometidos, de manera injusta e irresponsable, a los rigores de un proceso criminal.

No existe impedimento jurídico alguno para el establecimiento de una norma ejemplarizante como la expuesta. En palabras del Profesor Chiesa: "[n]o hay, por supuesto, impedimento constitucional para imponer al Estado cualquier tipo de sanción por el incumplimiento de su obligación de descubrir prueba a la defensa". (Enfasis suplido.)[7]

Ello no obstante, y como expresáramos al comienzo de la ponencia, con el propósito de evitar que el Tribunal emita una Sentencia absurda, adoptamos el curso decisorio de los compañeros Jueces que entienden que lo procedente es devolver el caso al tribunal de instancia para la celebración de una nueva vista preliminar.

FRANCISCO REBOLLO LOPEZ<br>
Juez Asociado

---

[7] **Chiesa Aponte**, op. cit. pág. 317.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Demandante-recurrido


       v.                          CC-99-297     Certiorari

José L. Ortiz Vega y Eugenio
J. Rodríguez Galindo


    Demandados-peticionarios


Opinión Disidente del Juez Asociado señor Negrón García a la cual se
une el Juez Asociado señor Corrada del Río




San Juan, Puerto Rico, a 8 de octubre de 1999

I

**Deferencialmente, el curso decisorio mayorita-rio invita a parafrasear a Lope de Vega, en su obra FUENTEOVEJUNA: "¿quién mató a [Barbarita]? ¡Fuenteovejuna, lo hizo!"**[8]

Se concluye equivocadamente que la **Vista Preliminar** no fue "conforme a derecho" pues antes de celebrarse, Fiscalía poseía, debió revelar y entregar a la defensa una supuesta **"evidencia exculpatoria"**, a saber, una grabación y dos informes conteniendo manifestaciones del testigo de cargo

---

[8] Editorial Bruño, España (1991), Tercer Acto, Verso 2101-2105, pág. 157.

Eliezer Santana Báez –**a título de recantación de que fue testigo ocular**

**(alegadamente a sugerencias y bajo presión de agentes investigadores**

**del C.I.C.)**–[9], hechas días antes de su testimonio jurado en  la aludida

_____

[9] Veamos los antecedentes y las circunstancias que se exponen en torno al origen de esas manifestaciones.

El 9 de junio de 1997 –un día después de su desaparición– se encontró en el área playera El Escambrón el cadáver de la niña Lillian Barbara Cepeda Casado (Barbarita). Al iniciarse la investigación surgieron varias teorías y la convergencia de la Policía y Depto. de Justicia, así como del Negociado Federal de Investigaciones.

El Depto. de Justicia asumió la investigación ante la posibilidad de que un menor, hermano de la víctima, estuviera involucrado. Descartada esa posibilidad, refirió la investigación nuevamente a la Policía y en comunicado de prensa informó **que su pesquisa reflejaba que la muerte no fue accidental;** que no había evidencia suficiente para concluir qué persona **estranguló a la menor** y; que la Policía continuaba investigando.

En septiembre de 1998, los investigadores descubrieron que Santana Báez –recluido en una institución penal– **conocía por haber participado en el secuestro que culminó en el asesinato de Barbarita.** El 16 de noviembre, Santana Báez prestó declaración jurada incriminando a Eugenio J. Rodríguez Galindo y José L. Ortiz Vega y, a petición suya, ingresó al Albergue para Protección de Víctimas y Testigos. Allí, al recibir numerosas amenazas de muerte, –a insistencia de Evangelino Martínez Peralta, cliente del albergue y líder de los conspiradores contra Santana Báez–, negó su participación. **A esos efectos, preparó grabación en la que expresó que a insistencias de los agentes del N.I.E. había declarado que presenció parte de los hechos <u>cuando en realidad los conoció porque el acusado Rodríguez Galindo se los relató</u>.** La grabación no terminó las amenazas contra su vida y el 27 de noviembre, **ante un inminente atentado,** Santana Báez, escapó del albergue. Horas más tarde fue arrestado y llevado a un albergue. Julio A. Carrasquillo Rivera prestó declaración jurada afirmando que advirtió a Santana Báez sobre el peligro y le aconsejó fugarse.

El agente del N.I.E., Héctor Fernández, preparó en manuscrito un Informe fechado 28 de noviembre, de tales incidentes (Apéndice J). En lo pertinente, consignó el siguiente diálogo con Santana Báez: que "los agentes del C.I.C., que agente, Torres y Figueroa me pusieron ahí en la escena del crimen pero yo nunca estuve allí, **eso de la muerte me lo dijo flaco, quién es flaco [Rodríguez Galindo], el que salió llorando en la televisión él me dijo cómo fue que moreno [Ortiz Vega] la violó y la mató;** pero tú estás seguro de lo que tú me estás diciendo, **yo estoy seguro, todo esto me lo contaron,** pero ellos los agentes (C.I.C.) me dijeron que así el caso no servía que tenían que ponerme a mí en la escena para que el caso fuera sólido, que estuviera tranquilo que esto estaba cuadrau. **Yo estoy seguro que ellos (flaco y moreno) lo hicieron pero no estuve allí".** El Informe, <u>in fine</u>, consigna que Santana Báez lo repitió en presencia del agente Edwin Monge.

Subsiguientemente, en el albergue, Santana Báez, aún temiendo por su vida y desconfiando de los agentes del N.I.E., reiteró en lo pertinente, su declaración de "que él (no) nunca estuvo presente en los hechos que éste está declarando; que los agentes del C.I.C. de San Juan, Homicidio, le pidieron que indicara que él estaba en el lugar de los hechos **pues si él declaraba que uno de los acusados le había dicho**

Vista Preliminar.[10] Sin decirlo taxativamente, para la mayoría allí no se desfiló prueba suficiente (en el **quantum** jurisprudencialmente requerido), y el testimonio de Santana Báez no era (ni es) digno de crédito.

Con el beneficio de los expedientes y minutas de la Vista Preliminar y los autos originales, rechazamos que **en este caso**, la Constitución, Leyes o las Reglas de Procedimiento Criminal impusieran al Ministerio Fiscal **a destiempo y prematuramente**, la obligación de descubrir y entregar a la defensa la grabación e Informes sobre las referidas manifestaciones no juradas atribuibles al testigo de cargo Santana Báez.[11] También, que en la Vista Preliminar no se haya desfilado suficiente prueba inculpatoria en derecho contra los peticionarios Rodríguez Galindo y Ortiz Vega.

---

**no tenían un caso**. Que hubo una Fiscal que le presentó unas Fotografías de unas niñas, para que él pudiera Id. a la víctima y él no pudo Id. a nadie que ésta misma le mostró la fotografía donde estaba la víctima, que durante el Line-Up un agente del C.I.C. de Homicidio le indicó que el sospechoso era uno Bien Flaco que el Resto de Hombres del Line-Up eran personas corpulentas, que constantemente lo mantuvieron intimidado en el caso." (Informe incidentes preparado en manuscrito por el agente del N.I.E. Monge, Apéndice K).

[10] Nada tiene de extraño que muchos crímenes sean esclarecidos en virtud de información suministrada tiempo después por uno de sus co-autores cuando están ingresados en las cárceles por otros delitos. Véase: Pueblo v. Rivero, Lugo y Almodóvar, 121 D.P.R. 454 (1988).

Por experiencia judicial acumulada, sabemos del dantesco y violento ambiente que a veces impera en las cárceles por gangas que luchan su control, por venganza o por "castigar" a reclusos sumariados a quienes se les ha imputado el asesinato o violación de infantes, menores, mujeres embarazadas o de avanzada edad; éstos se exponen a grave daño corporal o muerte. Véase, Pueblo v. Morales Roque, 113 D.P.R. 876 (1983) en que acusado de evadirse de institución penal, como defensa de "estado de necesidad", alegó que semanas antes, fue víctima de un atentado de asesinato por otro recluso, quién manifestó que lo mataría en el futuro.

[11] El sumario fiscal es privado y secreto. Santiago v. Bobb, 117 D.P.R. 153, 163 (1986); Silva v. F.E.I., res. en 24 de enero de 1995, 137 D.P.R. ___ (1995). Por ende, el Ministerio Fiscal no tiene el deber "de rutinariamente entregar su expediente completo al abogado de la defensa." United States v. Agurs, 427 U.S. 97, 111 (1976). [Tampoco que] "realice una detallada contabilidad a la defensa de toda la investigación en un caso." Moore v. Illinois, 408 U.S. 786, 795 (1972). (Traducciones nuestras).

**La mayoría traza mal las coordenadas jurídicas pertinentes**. Primero, según su evolución, el derecho de acceso a evidencia exculpatoria reconocido en <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963),[12] como regla general, no se activa **antes del juicio**. Segundo, no entra en juego, **si la defensa conoce y posee para el juicio dicha evidencia**. Tercero, se reivindica **después del juicio en virtud de una revisión judicial retrospectiva**. Ninguno de estos tres requisitos se cumplen en este caso. **Más importante, no estamos ante verdadera prueba exculpatoria, per se**.

Aún así, mediante una **aplicación mecanicista**, la mayoría anula innecesariamente unas acusaciones válidas y establece un <u>stare decisis</u> que trastoca el orden procesal, desvirtúa el propósito y los parámetros de la Vista Preliminar (**más que convertirla en un mini-juicio, la transforma en "el juicio en su fondo"**) y, desestabiliza el esquema,

---

[12] <u>Brady</u> v. <u>Maryland</u>, <u>supra</u>, impuso al Fiscal un deber afirmativo de producir en **el momento apropiado**, evidencia requerida que materialmente favorece al acusado, de forma directa o de impugnación. Para activar **con éxito** la doctrina de <u>Brady</u>, tienen que establecerse tres requisitos: 1) la supresión de evidencia por el Fiscal; 2) el carácter **favorable** de dicha evidencia; y 3) su materialidad. <u>Moore</u> v. <u>Illinois</u>, <u>supra</u>, 794-795. El criterio de materialidad originalmente formulado por el Tribunal Supremo federal requería que el acusado estableciera que la evidencia ocultada, evaluada en el contexto **de todo el récord**, creara una duda razonable sobre la culpabilidad. <u>United States</u> v. <u>Agurs</u>, 427 U.S. 97 (1976). Años después, en <u>United States</u> v. <u>Bagley</u>, 473 U.S. 667-682 (1985), se modificó para exigir prueba, también **a la luz de todo el récord**, de "razonable probabilidad" de un resultado favorable diferente, esto es, alterando el veredicto o la pena impuesta.

<u>United States</u> v. <u>Agurs</u>, <u>supra</u>, pág. 103 describió la doctrina de <u>Brady</u> como "descubrimiento, **después del juicio**, de información conocida por el Fiscal, pero desconocida para la defensa." (Traducción nuestra). No trata sobre descubrimiento antes del juicio ("pretrial discovery").

Aplicar a <u>Brady</u>, significa que la evidencia debe favorecer a la defensa. **El Ministerio Fiscal no tiene obligación de mostrar evidencia incriminatoria o neutral**. La evidencia favorable ha sido descrita como aquella que "de su faz es favorable y directamente exculpatoria o mitigante". Note: <u>A Defendant's Right to Inspect Pretrial Congressional Testimony of Government Witnesses</u>, 80 L.J. 1388, 1400 (1971). Puede ser pertinente a la credibilidad del testigo y referirse a manifestaciones previas inconsistentes. <u>Giglio</u> v. <u>U.S.</u>, 405 U. S. 150 (1972); <u>United States</u> v. <u>Bagley</u>, <u>supra</u>. Sin embargo, evidencia que sólo sea útil a la defensa, no cae bajo el manto <u>Brady</u>. <u>Giles</u> v. <u>Maryland</u>, 386 U.S. 66 (1967).

Ahora bien, hemos de recordar la admonición del Supremo federal de que el "**[f]iscal prudente resolverá las preguntas dudosas a favor del descubrimiento**". <u>United States</u> v. <u>Agurs</u>, <u>supra</u>, pág. 108. (Traducción

balance y límites del descubrimiento de prueba consagrado en las Reglas
de Procedimiento Criminal vigentes.[13]

II

**Para arribar a esa decisión la mayoría ha optado por anular
automáticamente la Vista Preliminar sin hacer una revisión y evaluación
integral en retrospectiva de la prueba desfilada en la aludida Vista
Preliminar.** Se dice que su dictamen no expresa "juicio definitivo alguno
sobre la credibilidad del testigo Santana Báez". (Opinión, pág. 19). Sin
embargo, las mismas razones aducidas para remitir a una nueva Vista
Preliminar, tienen el impacto decisorio y efecto neto de caracterizar a
priori, como **prueba exculpatoria per se**, las manifestaciones extra-judiciales
de Santana Báez.

Al respecto, se asevera que es el único testigo de cargo y "tipo de
persona cuyo testimonio de ordinario [no] provoca o inspira confiabilidad
fácilmente". (Id., págs. 14-15). Lo clasifica como "delincuente
consuetudinario, **dado a mentir**, cuyas declaraciones deben sopesarse con mucho
cuidado". (Id., pág. 15). Afirma que antes de la vista preliminar, cambió
varias veces "su versión de **los hechos**, **aún cuando hemos visto (esc. 1,
ante), que la modificación crucial no fue sobre los hechos, sino de que no
fue testigo ocular.** Aduce que el testigo ha insistido fue "presionado por los
agentes del orden público" para declarar que presenció los hechos. (Id.)
Finalmente, para la mayoría, esas manifestaciones hechas en tres ocasiones
distintas –suponemos que por su verdadero contenido intrínseco– "pueden tener
el efecto de **destruir totalmente la determinación de causa probable".** (Id.)

---

nuestra).

[13] El alcance que debe darse al descubrimiento de prueba en lo penal
ha generado, en y fuera de los estrados, intenso debate.

En apretada síntesis, los que abogan su extensión, enfatizan que
los procesos constituyen la búsqueda de la verdad, no una teoría
deportiva de la justicia, deben ser justos y eliminar el juego de
ciegos ("games of blind man's bluff") o juicios sorpresivos ("trial by
surprise").

En contra, se expone el **argumento de reciprocidad. Aducen que en
lo penal, a diferencia del descubrimiento en lo civil –los derechos
constitucionales de los acusados, en particular el privilegio a no
auto-incriminarse–, impide lograr el balance y la reciprocidad total
que presupone el descubrimiento. Si al igual que en lo civil, no se
logra que el descubrimiento sea una vía de dos tránsitos contrarios,
("two-ways street") se estaría creando un mayor desbalance a favor del
acusado.** Arguyen además, que un descubrimiento tan amplio como el
propuesto facilitaría el perjurio, es decir, permitiría fabricar
teorías defensivas que evadan la detección de perjurio, al conocer
detalles de la evidencia en poder del fiscal. Señalan también, que
podría utilizarse para intimidar testigos de cargo. Finalmente
sostienen, que al considerar estos factores y las alternativas
existentes para evitar sorpresas que afectan el juicio justo, el
"precio" del descubrimiento amplio y liberar, no supera sus beneficios.

Como respuesta, los proponentes sostienen que los costos aludidos,
de existir, se exageran y las alternativas para evitar sorpresas en los
juicios no son efectivas. La Fave & Israel, Criminal Procedure, second
edition, West Publishing Co., St. Paul, 1992, págs. 836-842.

**El argumento jurídicamente más sólido es el relacionado con la
imposibilidad –sin chocar con la Constitución–, de evolucionar y lograr
entre Ministerio Fiscal y acusado verdaderamente la reciprocidad en que
se basa un esquema balanceado y justo sobre descubrimiento de prueba.**

Se trata de una conclusión mayoritaria implícita **de mendacidad**, pues inextricablemente tiende a prejuzgar, tachar y descartar (fatal y definitivamente), la credibilidad <u>total</u> de Santana Báez. **Dificulta, por no decir imposibilita, cualquier explicación o intento de rehabilitación por parte del Ministerio Fiscal o, de sostener la causa probable en las admisiones, más la restante prueba testifical y documental.** La mayoría ignora así la doctrina de que el **"que un testigo falte a la verdad en una parte de su testimonio no conlleva que necesariamente deba descartarse el resto de la declaración.** <u>Pueblo</u> v. <u>López Rivera</u>, 102 D.P.R. 359 (1974); <u>Pueblo</u> v. <u>Espinet Pagán</u>, 112 D.P.R. 531 (1982). **La máxima falsus in uno, falsus in omnitus no autoriza a rechazar toda declaración de un testigo porque se haya contradicho o faltara a la verdad en parte de su testimonio.** <u>Pueblo</u> v. <u>Méndez Feliciano</u>, 90 D.P.R. 449 (1964)". <u>Pueblo</u> v. <u>Pagán Ortiz</u>, 130 D.P.R. 470, 483 (1992).

### III

**No compartimos esa respetable ruta decisoria. Escogemos la metodología adjudicativa, a nuestro juicio correcta:**[14] una revisión en retrospectiva de toda la prueba testifical y documental desfilada en la Vista Preliminar[15]

---

[14] **Salvo que cada ocultación de prueba se estime error automático, esa no es la metodología adjudicativa a seguirse.** "No podemos consistentemente tratar toda ocultación de prueba exculpatoria como si fuese un error. Por ende, el Juez no debe ordenar un nuevo juicio cada vez que no pueda caracterizar una omisión a descubrir como **perjudicial** bajo la acostumbrada medida ('standard') de **error-perjudicial**. Bajo esa medida, cuando el error está presente en el récord, el Juez revisor debe dejar sin efecto el veredicto y sentencia, a menos que 'esté convencido de que el error no influenció al jurado, o tuvo un efecto menor'. <u>Kotteakos</u> v. <u>United States</u>, 328 U.S. 750, 764.

Y posteriormente, en <u>United States</u> v. <u>Bagly</u>, <u>supra</u>, págs. 675-676, en el texto original se reafirmó así la norma de <u>Brady</u>: "para reiterar un punto crítico, el Fiscal no viola su deber constitucional de revelar a menos que su omisión sea de suficiente significado para resultar en una negativa al derecho del acusado a un juicio justo." Y en la misma página 675 (esc. 7, <u>in fine</u>), se advierte que "[m]ás aún, la regla de que el Fiscal comete error al fallar en divulgar evidencia favorable al acusado, no importa cuán insignificante sea, impondría una carga imposible al Fiscal y minaría el interés de finalidad de las sentencias." (Traducciones nuestras).

[15] Conforme el expediente judicial y minutas de la Vista Preliminar, las mismas se celebraron ante el Juez, Hon. Ferdinand Mercado el 16 y 17 de diciembre de 1998.

---

Un meticuloso examen de ese expediente, sobre todo las minutas y notas, nos permiten concluir que, contrario a la conclusión mayoritaria, **la determinación de causa probable se fundó —no sólo en el testimonio de Santana Báez— sino en un análisis integral de toda la prueba testifical y documental del Ministerio Fiscal.**

Del **Ministerio Fiscal**, el Magistrado recibió testimonios —directo y contrainterrogatorio—, de los testigos Carmen Casado, Policía Edgardo Rivera Navedo, **Santana Báez**, Lydia Alvarez Pagán, Directora Ejecutiva del Instituto de Ciencias Forenses. Por la **defensa**, los testimonios de Jorge L. Agosto, Magaly Rodríguez, Pablo Rodríguez, Carlos José Suárez y Anthony Batista.

Además, evaluó la siguiente prueba documental, que luego de ser identificada por los testigos, fue admitida en evidencia: Exh. I (foto del Área del Escambrón); Exh. II(a-f); Exh. III (Acta de Rueda de Confrontación); Exh. IV (Siete (7) fotos del cuerpo de Barbarita mostrando traumas recibidos): Exh. V (Informe Médico-Forense); Exh.VI (Certificación de la Autoridad Metropolitana de Autobuses de que estaba

**frente al potencial de las manifestaciones <u>alegadamente exculpatorias</u>**. La misma demuestra que, distinto a la conclusión mayoritaria, **las manifestaciones extrajudiciales, no juradas, del testigo de cargo Santana Báez, <u>no son exculpatorias, per se</u> y por ende, razonablemente podemos concluir que no cambian el resultado ni anulan la Vista Preliminar celebrada.**

De entrada, nadie cuestiona seriamente que la declaración que Santana Báez suscribió y juró ante el Fiscal el **16 de noviembre de 1998** -que sirvió de base a la causa probable para el arresto-, **como coautor, <u>incriminó directamente a Rodríguez Galindo y Ortiz Vega en el secuestro y eventual asesinato de la niña Lilliana Bárbara Cepeda Casado (Barbarita)</u>.**[16] Copia de esta declaración le fue entregada a sus abogados en la Vista Preliminar; de hecho, a su solicitud, **se estipuló y convirtió en Exh. I, defensa**. En ésta, según hemos visto (esc. 5 <u>ante</u>), Santana Báez describió su vida e historial delictivo, en unión a su amigo Rodríguez Galindo -consistente de robo de mercancías de tiendas, hurto de automóviles y prostitución con hombres-, para costear el uso de marihuana y heroína. Además, detalló la agresión y secuestro que precedió a la violación y asesinato de Barbarita por los peticionarios Rodríguez Galindo y Ortiz Vega. **A modo de paréntesis, no cabe duda que el conocimiento íntimo de esos hechos sólo lo produce una participación directa o el relato por uno de sus protagonistas. "[El] reconocimiento de una actividad criminal de ordinario se hace ante amigos o gente en la que el declarante confía"**. <u>Pueblo</u> v. <u>Mendoza Lozada</u>, 120 D.P.R. 815, 820 (1988).

Difícilmente puede argumentarse sorpresa o ignorancia de parte de los peticionarios y sus abogados del carácter de delincuente de Santana Báez (apodado "mala muerte"), y su condición de usuario de sustancias controladas. En el directo, Santana Báez reafirmó su vida delictiva y amistad con

---

funcionando y prestando servicios durante el día del crimen); Exh. VII(a-k), (once (11) fotos de la niña Amandita).

[16] En esta declaración, llena de **penosos, pero reveladores detalles del historial delictivo de los protagonistas y el morboso crimen**, -previas las advertencias de ley y **en presencia y con la firma de su madre, Sra. Norkalis Báez**-, Santana Báez **juró** ante el fiscal Rubén Guzmán, que conoció a Rodríguez Galindo a los 14 ó 15 años, **mientras robaba dulces en una tienda. Desde esa época, utilizaba sustancias controladas junto a él. Sufragaban el vicio, robando y prostituyéndose con otros hombres.**

El 8 de junio de 1997 acompañó a Rodríguez Galindo al área del Escambrón en un jeep Suzuki blanco de capota negra, a buscar $1,000.00. En el trayecto, **enrolaron e ingirieron marihuana y heroína**. Al llegar al Escambrón, se aproximaron a uno de los estacionamientos donde estaba una niña sentada en un muro amarillo cerca de la carretera. Rodríguez Galindo se detuvo frente a ella y la montó en la parte trasera del vehículo. **La golpeó con la culata de una pistola dejándola inconsciente y ordenó a Santana Báez montarse en la parte de atrás del vehículo.**

Más adelante, en el otro estacionamiento, recogió a un sujeto quien reprochó a Rodríguez Galindo que estuviera acompañado con Santana Báez. **Aquél le dijo que no se preocupara pues Santana Báez era de confianza.** Acto seguido, Santana Báez, los ayudó a trasladar la niña al área de una uvas playeras. **De camino, el sujeto se viró y amenazó con matarlo si decía algo.** El sujeto estaba con la niña abajo, en el interior de las uvas playeras mientras Rodríguez Galindo observaba hacia fuera.

Santana Báez optó por irse del lugar. Tomó un autobús de la Autoridad Metropolitana de Autobuses (A.M.A.) hacia San Juan y luego otro, hacia Río Piedras, donde estuvo prostituyéndose toda la noche. La mañana siguiente fue a buscar a Rodríguez Galindo a su casa y **mientras consumían drogas, Rodríguez Galindo le dijo que tuvieron que matar a la niña a golpes porque se despertó mientras la violaban. Declaró además, que Rodríguez Galindo le indicó que el sujeto era el padrastro [Ortiz Vega] de la niña y quería que lo matara a él.**

Rodríguez Galindo y relató demás particularidades del crimen. **Fue contrainterrogado extensamente**. Los abogados de la defensa demostraron que en esos momentos estaba en la cárcel por "car jacking". Le pidieron describir el "jeep" y lo pusieron a dibujar en la pizarra la escena del secuestro y crimen (acera; "parking"; dónde estaba Barbarita sola comiendo un mantecado); cómo Rodríguez Galindo la cogió, la agredió y montó en el Jeep, y cuándo Ortiz Vega la sacó.

**Con vista al conocimiento de su historial delictivo y usuario de sustancias controladas, los peticionarios y sus abogados tuvieron amplia oportunidad para explorar y ampliar esos extremos y además, cuestionar su credibilidad, incluso formular la pregunta clásica de si con anterioridad, Santana Báez había prestado alguna declaración o hecho manifestaciones inconsistentes, contradictorias o que alterara la misma, o, si había sido presionado por las autoridades, o, si le habían ofrecido inmunidad.**

**Ciertamente, tampoco el magistrado estaba ajeno al problema de credibilidad que presentaba el testigo Santana Báez.** Al determinar causa probable sabía muy bien que su dictamen en parte descansaba en el testimonio de un delincuente habitual, de dudosa reputación; claro está, apreciado a la luz de los demás testimonios de los otros testigos y la prueba documental corroborativa (fotos del sitio, Informe forense, golpes y demás detalles). **Así, en esa etapa, para fines del <u>quantum</u> de prueba exigido, estimó que toda la prueba podía "ser creída por una persona razonable y de consciencia no prevenida, sin entrar a dirimir la credibilidad que amerita la prueba presentada".** <u>Pueblo</u> v. <u>Andaluz Méndez</u>, res. en 30 de junio de 1997, 143 D.P.R. ___ (1997). A fin de cuentas, si no están afectados los sentidos de un adicto, su testimonio no debe ser "destruido como instrumento evidenciario". <u>Pueblo</u> v. <u>Mendoza Lozada</u>, <u>supra</u>, 820.

**Pero hay más. A poco profundicemos, vemos que no son exculpatorias <u>per se</u>, las manifestaciones grabadas extrajudicialmente, <u>ex parte</u>,** en la que, si bien Santana Báez negó su participación directa y conocimiento **ocular** del crimen (salirse de participar), **indudablemente inculpó a Rodríguez Galindo porque éste se lo relató.** Lo mismo pasa con las manifestaciones contenidas en los Informes de los agentes Fernández y Monge al decir en **dos ocasiones** que no estuvo en el lugar de los hechos y que fueron los agentes quienes le indujeron a situarse allí.

**El primer Informe consigna que afirmó que lo "de la muerte [de Barbarita] me lo dijo flaco [Rodríguez Galindo], quien es flaco, el que salió llorando en la televisión, él me dijo cómo fue que Moreno [Ortiz Vega] la violó y la mató,... Yo estoy seguro que ellos (Flaco y Moreno) lo hicieron pero no estuve allí..."** (Énfasis suplido). Lo mismo surge del **segundo** Informe, al reafirmar que no estuvo presente, pero **"que uno de los acusados le había dicho..."**

**<u>En su sustrato, la declaración jurada y las tres (3) manifestaciones de Santana Báez –vía confesión como coautor o admisión de Rodríguez Galindo– constituyen suficiente evidencia legal admisible en un juicio plenario[17], y tienen el denominador común de consistentemente relacionar e inculpar directamente a éste último y Ortiz Vega en el secuestro y posterior asesinato de Barbarita</u>.**

**Tampoco son exculpatorias las pruebas del polígrafo del 22 de octubre de 1998 y 16 de abril de 1999. Independientemente de si son admisibles o no en evidencia, sus resultados no favorecen ni exoneran a los peticionarios Rodríguez Galindo y Ortiz Vega. Revelan, en opinión del poligrafista Edrick Torres, que el conocimiento de los hechos que tiene el testigo Santana Báez "fue por una participación directa de los hechos"; "que él estuvo en las plantas de uvas playeras" donde asesinaron a Barbarita. Según esas pruebas, <u>miente únicamente para exculparse de haber participado directamente</u>.**

En resumen, al momento de celebrarse la Vista Preliminar, mediante

---

[17] La Regla 62 (A) de Evidencia sobre Admisiones, admite como excepción a la regla de exclusión de prueba de referencia, **declaraciones ofrecidas contra un acusado si es hecha por éste en su capacidad individual. <u>Pueblo</u> v. <u>López Guzmán</u>, 131 D.P.R. 867 (1992).**

testimonio jurado el testigo Santana Báez indudablemente se retractó de las previas manifestaciones extrajudiciales en que se "salía" del sitio y auto-exoneraba de haber participado en el crimen. Al así hacerlo, retomó y reafirmó su declaración original jurada del 16 de noviembre e incuestionablemente relacionó a los peticionarios en el secuestro y asesinato de Barbarita. Ello, a la luz de la restante prueba testifical y documental, **fue suficiente para una determinación de causa probable conforme a derecho.**

Aún tomando las aludidas manifestaciones desde el punto de vista más favorable a la defensa y trasladarlas en retrospectiva al escenario de la Vista Preliminar –para fines de análisis revisorio–, **cuando las unimos a la restante prueba testifical y documental (indirecta o circunstancial) corroborante, de su faz podemos concluir que razonablemente no alteraría el resultado de causa probable. No se trata de testimonio inherentemente irreal, increíble o improbable. Tampoco estaría carente de garantía circunstancial de veracidad, al menos en el extremo de las admisiones incriminatorias hechas por Rodríguez Galindo a Santana Báez, en las cuales implicó a Ortiz Vega.** "[L]a evidencia circunstancial es intrínsecamente igual que la evidencia directa." Pueblo v. Pagán Ortiz, supra, pág. 479 y casos allí citados. **Repetimos, no estamos autorizados a automáticamente rechazar toda declaración de un testigo porque se haya contradicho o falte a la verdad en parte de su testimonio.** Pueblo v. Pagán Ortiz, supra.

**Ante estas realidades, ¿cómo puede sostenerse entonces la premisa inarticulada mayoritaria de que estamos ante prueba exculpatoria per se, que el Ministerio Fiscal tenía el deber de entregar antes de la vista preliminar? ¿Cómo afirmar que la certeza de esas tres manifestaciones "pueden tener el efecto de destruir totalmente la determinación de causa probable que se hizo en este caso"? ¿Por qué descartar a priori su valor evidenciario, si como admisiones siempre incriminan a su expositor Rodríguez Galindo y éste, a su vez, a Ortiz Vega en el secuestro y asesinato de Barbarita? ¿Por qué ignorar la restante prueba testifical y documental corroborativa?**

**A lo sumo, ¿no estamos ante un problema de prueba parcialmente contradictoria, sujeta su valor a ser dirimido en el juicio en su fondo?**[18] Pueblo v. Andaluz Méndez, supra.

IV

**Exculpar** viene del latín **"ex-culpa, exento de culpa es declarar a alguien no culpable de cierta cosa o creer o sostener que no es culpable".** G. Cabanellas, Diccionario Enciclopédico de Derecho Usual, (Ed. Heliasta), Tomo III, pág. 1251. Una lectura de la jurisprudencia y los comentaristas nos permite apreciar, que por su naturaleza y efecto, en derecho probatorio penal técnicamente existen dos tipos de prueba exculpatoria,[19] **la absoluta, per se,**

---

[18] Hemos caracterizado las declaraciones extrajudicia-les de testigos de cargo que se retractan del testimonio judicial, como "inherentemente sospechos[as] y de ordinario no constituye base adecuada para la concesión de un nuevo juicio". Pueblo v. Chévere Heredia, res. en 22 de agosto de 1995, 139 D.P.R. ___ (1995). Son muy poco confiables "porque generalmente se hacen [...] al margen del ambiente solemne del tribunal, a instancias de partes interesadas, **por testigos muy susceptibles a intimidación o sugestión, dados a testimonios inconsistentes.**" Pueblo v. Chévere Heredia, supra.

[19] En su concepción original, las llamadas **declaraciones exculpatorias** se definían como "aseveraciones del acusado que en un momento intentaron demostrar su inocencia, pero, que en el juicio tienden a incriminarlo. Un uso frecuente que el fiscal hace de las declaraciones exculpatorias, es presentarlas en conjunto con evidencia que tiende a establecer su falsedad. El jurado es entonces llamado a inferir del hecho de que el acusado brindo una falsa declaración exculpatoria, que estaba consiente de su culpabilidad y, en última instancia, era culpable. Aparte de esta ruta 'conciencia de culpabilidad', declaraciones exculpatorias y admisiones, claro está, pueden también utilizarse para probar la culpabilidad de diferentes maneras circunstanciales.

En general es poco probable que estas tradicionales distinciones,

**y la relativa (que sirve para impugnar o desmerecer la credibilidad de un testigo).** Cualquiera de éstas, a su vez, puede ser directa o circunstancial de carácter testifical, documental, tangible, científico, etc. Como sucede muchas veces, definirlas es fácil; sin embargo, lo difícil es reconocerlas y aplicarlas en casos individuales debido al amplio abanico de posibilidades que las variantes en la conducta y reacción humana generan, fluctuaciones en los métodos de investigación y otros factores imponderables susceptibles de presentarse.

Conceptualmente hablando, prueba exculpatoria **absoluta**, **per se**, es aquella que de su faz, ante un juzgador, directa y fehacientemente demuestra la inocencia y exonera a un sospechoso, denunciado o acusado, esto es, lo **excluye de ser autor del delito objeto de investigación o encausamiento. Como el Ministerio Fiscal está obligado a hacer prevalecer la verdad y la justicia, ante prueba legítima exculpatoria absoluta, per se, convencido de que los cargos no pueden prevalecer —no importa la etapa procesal que sea—, tiene el deber profesional y ético de sua sponte descubrirla o de someterla al Tribunal y solicitar su archivo. Esa no es la situación de autos.**

Bajo la categoría de prueba **exculpatoria per se (absoluta)** estarían algunas pruebas —debidamente autenticadas— de sangre de reconocida confiabilidad en el mundo médico-forense (Incompatibilidad sanguínea y DNA); pruebas de balística y parafina, huellas dactilares y otras; protocolo de autopsia exculpatorio. También en el ámbito testimonial, la **confesión corroborada** de un testigo exonerando **totalmente** al acusado.[20] De esta

---

tengan mucha validez, al menos con relación a las muchas controversias sobre confesiones. Miranda v. Arizona, por ejemplo, claramente rechazó la distinción en lo que respecta a su determinación. Así los requisitos de Miranda deben ser observados para establecer la admisibilidad de cualquier declaración incriminatoria resultado de un interrogatorio bajo custodia, aun cuando esa declaración podría, en términos tradicionales, ser categorizada como admisión o declaración exculpatoria. Queda la posibilidad de que algunos requisitos legales apliquen a declaraciones del acusado que se consideren completamente incriminatorias, brindadas por la fiscalía, tal como se aplican a las tradicionalmente conocidas como confesiones." McCormick on Evidence, Tercera Ed., (1989), pág. 362, (traducción nuestra).

[20] Sin pretensiones de agotarla, la casuística en la jurisdicción federal y estatal sobre **evidencia exculpatoria, per se,** nos brinda varias modalidades.

**Ministerio Fiscal ocultó prueba de que otro sospechoso, de hecho, cometió el delito:**– Cannon v. Alabama, 558 F. 2d. 1211 (5th. Cir. 1977), existencia de testigo ocular que identificó a otro, no al acusado; Wilkinson v. Ellis, 484 F. Supp. 1072 (E.D. Pa. 1980), destruyó grabación de un tercero confesando haber cometido el delito; Aplication of Kapatos, 208 F. Supp. 883 (S.D. N.Y., 1962) ocultó evidencia de que dos testigos oculares habían visto a otras dos personas, no al acusado, correr hacia un automóvil cerca del lugar al momento del homicidio; y Nelson v. State, 59 Wis. 2d. 474, 208 N.W. 2d. 410 (1973), cómplice-testigo testificó en el juicio que el acusado había disparado a la víctima y el Fiscal suprimió evidencia de la confesión de dicho testigo a un compañero de celda de que él mismo era quien le había disparado).

**Evidencia Exculpatoria o falsa relacionada con manifestaciones previas inconsistentes de testigos:** Lindsey v. King, 769 F. 2d. 1034 (5th. Cir., 1985) ocultación de declaración previa de testigo ocular (que identificó en el juicio al acusado) y decía que no podía identificar al que cometió el crimen; United States v. Anderson, 574 F. 2d. 1347 (5th. Cir. 1978), declaración previa demostrativa que el testigo participó en el crimen; Davis v. Heyd, 479 F. 2d. 446 (5th. Cir. 1973), manifestaciones previas inconsistentes del testigo que apoyaban defensa acusado de que la muerte fue accidental; y Napue v. Illinois, 360 U.S. 264 (1959), ocultación de acuerdo

enumeración –no exhaustiva– aflora la característica medular de prueba **exculpatoria absoluta _per se_; de ordinario, la misma no presenta una controversia que exija dirimir credibilidad.**

En contrario, prueba **exculpatoria relativa** se centra sobre la credibilidad testimonial. Puede favorecer la defensa, pero no acredita con certeza la inocencia del acusado, esto es, **no es exculpatoria _per se_.**

Numerosas causas judiciales penales revelan que su utilidad es para impugnar el testigo. Tiene un potencial de ocurrencia mayor en situaciones en que un testigo de cargo: a) hace una declaración extrajudicial incompatible con la declaración jurada ante el fiscal durante la investigación, o cuando se retracta de la misma en su testimonio jurado en recinto judicial, o cuando se contradice en extremos que pudieran ser esenciales, tales como identificación o descripción física del acusado; escena del delito; clase de armas;[21] b) existe una convicción previa por perjurio; c) demuestra prejuicio contra el acusado; d) se producen falsas declaraciones en sus planillas de contribución sobre ingresos; e) demuestra reputación de persona mendaz en la comunidad; f) refleja algún grado de incapacidad mental; g) resultado negativo en una prueba de polígrafo.

V

**Más allá de lo inmeritorio del alegato de prueba exculpatoria _per se_**, bajo la cláusula constitucional del debido proceso de ley según el esquema actual de nuestro ordenamiento procesal penal, jurisprudencial y reglamentario, **tampoco el Ministerio Fiscal estaba obligado a descubrir los documentos y grabación reclamados por Rodríguez Galindo y Ortiz Vega antes de presentarse formalmente la acusación por asesinato.[22]**

---

de inmunidad entre Fiscal y testigo para lograr su testimonio.

**Ministerio Fiscal ocultó o presentó testimonio falso sobre evidencia física**: United States ex rel Almeida v. Baldi, 195 F. 2d. 815 (3rd. Cir. 1952), ocultó bala e informe balístico demostrativo de que la policía, no el acusado, mató a la víctima; People v. Walker, 180 Colo. 184, 504 P. 2d. 1098 (1973), Fiscal ocultó revólver de la víctima e informe balístico que apoyaba el reclamo de **defensa propia**; Miller v. Pate, 386 U.S. 1 (1967), Fiscal confundió al jurado al representarles que las manchas en una ropa alegadamente perteneciente al acusado correspondían a la víctima aún cuando sabía que las manchas eran de pintura; Alcorta v. Texas, 355 U.S. 28 (1957), Fiscal intencional-mente excluyó información de una declaración escrita del testigo, mostrada a la defensa, que establecía que dicho testigo había mantenido relaciones íntimas con la esposa asesinada; People v. Loftis, 370 N.E. 2d. 1160 (1977), Víctima de violación testificó que el acusado le desgarró la ropa y el Fiscal ocultó la ropa no desgarrada; People v. Wisniewski, 290 N.E. 2d. 414 (1977), acusado alegaba que mató a la víctima después que ésta lo atacó con un tubo y el Fiscal ocultó el tubo encontrado en la escena; Airline v. States, 294 N.E. 2d. 840 (1973) y Commonwealth v. Lam Hal, 461 N.E. 2d. 776 (1984), Fiscales ocultaron cuchillos que apoyaban teoría defensa propia.

[21] Dificultades dimanantes del grado de agudeza mental, inteligencia, preparación educativa, percepción –color y forma del cabello, ojos, tez, edad, peso, estatura, vestimenta–, cálculos en distancia y velocidad –diferentes formas de armas de fuego, pérdida y posterior recuperación de la memoria–, imposibilitan que normalmente una persona en calidad de testigo –salvo aquellas dotadas con memoria "fotográfica"– puedan repetir ad verbatim una declaración; siempre existen de buena fe, lapsus, lagunas y errores en cálculos.

Nuestra jurisprudencia reconoce esta realidad en el ámbito de valorar y adjudicar la prueba, a través de la norma de que omisiones y contradicciones sobre hechos no esenciales, no desmerecen la credibilidad de un testigo.

[22] Luego de la válida determinación de causa probable para arresto el 16 de noviembre de 1998, por la muerte de **Barbarita**, el 16 y 17 de

Al hacerse eco de esa pretensión, la mayoría por <u>fiat judicial</u> enmienda sustancialmente hoy las Reglas de Procedimiento Criminal vigentes, hace de la vista preliminar **un juicio**, y desarticula la armonía, balance y orden procesal en materia de descubrimiento. **Nos explicamos.**

El descubrimiento de prueba, **expresamente** visualizado en la Regla 95 de Procedimiento Criminal, sólo procede **"[p]revia moción del acusado sometida en cualquier momento después de haberse presentado la acusación o denuncia y dentro del término prescrito para someterla...".**

Esta Regla "establece que la obligación del fiscal de descubrir información o evidencia a la defensa **se activa con la presentación del pliego acusatorio**, esto es, con la denuncia en caso de delito menos grave o con la acusación en caso de delito grave." Chiesa, <u>Derecho Procesal Penal de Puerto Rico y Estados Unidos</u>, Vol. II, sec. 10.3, pág. 42.

**En el ámbito procesal penal de descubrimiento de prueba, la mayoría altera injustificada y peligrosamente nuestro estado de derecho expuesto en** <u>Pueblo</u> v. <u>Echevarría Rodríguez</u>, 128 D.P.R. 299 (1991); <u>Pueblo</u> v. <u>Romero Rodríguez</u>, 112 D.P.R. 437 (1982); <u>Pueblo</u> v. <u>Cancel Hernández</u>, 111 D.P.R. 615 (1981); <u>Pueblo</u> v. <u>Rodríguez Sánchez</u>, 109 D.P.R. 243 (1979). Dicha normativa –establecida según indicado en <u>Brady</u> v. <u>Maryland</u>, <u>supra</u>– y adoptada en nuestra

---

diciembre se celebró la Vista Preliminar y el 14 de enero de 1999, se leyeron las acusaciones. **En esta fecha, <u>antes</u> de que la defensa presentara moción del 19 de enero a esos fines y activara el descubrimiento, el Ministerio Público le informó que le entregaría una grabación e informes del N.I.E., hecha por el co-autor, testigo principal de cargo, Santana Báez.**

Ante la necesidad de fotocopiar todos los documentos objetos del descubrimiento, el Fiscal indicó a la representación legal de la defensa, Lcdo. Roberto Alonso Santiago, que lo llamaría para que pasara a recogerlas. Le informó además, el contenido de unas grabaciones, quién las tomó, dónde y las circunstancias en que se produjeron. **Al día siguiente, la defensa reveló el contenido de la grabación en conferencia de prensa.** El 15 de enero de 1999, el Ministerio Público advirtió al Tribunal de Primera Instancia lo ocurrido y aclaró su disposición de siempre entregar toda la prueba a la defensa y nunca haber ocultado evidencia exculpatoria. El mismo día la defensa informó al Tribunal la gestión del Ministerio Público, caracterizándola de **"acto de gran responsabilidad ética, atendiendo la máxima de preservar y adelantar la pureza de los procedimientos".** Requirieron además, la grabación. El 19, solicitaron descubrimiento de prueba mediante moción denominada **"Primera Moción** al Amparo de la Regla 95 de las de Procedimiento Criminal".

Subsiguientemente pidieron la desestimación de las acusaciones. El 25 de marzo de 1999, notificada el 29, el Tribunal de Primera Instancia denegó la desestimación y supresión de identificación. El 13 de abril, el Tribunal de Circuito de Apelaciones confirmó. El 23 de abril, previa petición de <u>certiorari</u> y auxilio de jurisdicción, concedimos al Procurador General término para que mostrara causa por la cual no debíamos revocar el dictamen del Tribunal de Circuito de Apelaciones.

Con vista a su comparecencia, proveímos no ha lugar al <u>certiorari</u> y auxilio de jurisdicción. En reconsideración, el 29 de mayo, la mayoría del Tribunal ordenó al Ministerio Público que mostrara causa por la cual no debiera reconsiderarse, expedir, revocar al Tribunal de Circuito y **devolver al Tribunal de Primera Instancia para la celebración de una nueva vista Preliminar.**

jurisdicción, busca evitar se celebren **juicios injustos** sin que la defensa tenga acceso a evidencia exculpatoria conocida por el Ministerio Público. **No crea un derecho constitucional a descubrimiento antes del juicio**. <u>Weatherford</u> v. <u>Bursey</u>, 429 U.S. 545 (1977).[23]

**La regla general es que no hay exigencia alguna de descubrimiento de prueba exculpatoria antes del juicio**.[24] Sólo si resulta demasiado oneroso para la defensa, por excepción, debe descubrirse antes del juicio, **pero después de la acusación**. La Fave & Israel, <u>Criminal Procedure Hornbook Series</u>, second edition, West Publishing, 1992, Sec. 20.7, págs. 894-895.

Salvo cuando verdaderamente estamos ante **evidencia exculpatoria, <u>per se</u>**, requerir al Ministerio Fiscal revelar anticipadamente cualquier evidencia que potencialmente pudiera ser favorable al acusado, desnaturaliza la vista preliminar, convirtiéndola en un **juicio plenario**, escenario que siempre hemos rechazado. <u>Pueblo</u> v. <u>Andaluz</u>, <u>supra</u>; <u>Pueblo</u> v. <u>Rodríguez Aponte</u>, <u>supra</u>. El fiscal tiene el derecho a elegir la evidencia que va a usar en esta etapa para cumplir el modesto <u>quantum</u> de prueba exigido. No está obligado a revelar prueba que teóricamente pudiera ser favorable a la defensa, como lo serían, convicciones previas de testigos de cargo, testimonios conflictivos, etc. A fin de cuentas, en la vista preliminar el magistrado no tiene que recibir prueba de defensa **"que requiera resolver cuestiones de credibilidad que correspondan a la etapa del juicio"**. <u>Pueblo</u> v. <u>Andaluz</u>, <u>supra</u>.

En conclusión, no existe en este caso argumento persuasivo de debido proceso de ley. **Las manifestaciones extrajudiciales del testigo de cargo Santana Báez no son exculpatorias <u>per se</u>. Aunque pudieran ser útiles a la defensa para propósitos de impugnación, no acreditan fehacientemente la inocencia de los imputados; <u>por el contrario, como admisiones, los incriminan</u>.**[25]

---

[23] Nuestras reglas y jurisprudencia satisfacen plenamente la exigencia constitucional de debido proceso de ley y obliga al Estado revelar a la defensa evidencia exculpatoria. **Dicha exigencia se cimienta en el derecho que asiste a todo acusado a un juicio justo**. Si el Estado no descubre a la defensa evidencia exculpatoria, que de haberse suministrado oportunamente, con razonable probabilidad, **el resultado del juicio** hubiera sido distinto, se anula la condena y **ordena un nuevo juicio**. <u>Pueblo</u> v. <u>Rivera Rodríguez</u>, res. en 31 de marzo de 1995, 138 D.P.R. ___ (1995). Es decir, sobre la omisión a descubrir, nuestra casuística, al igual que la norteamericana, -<u>Wood</u> v. <u>Bartholomew</u>, 116 S. Ct. 7 (1995); <u>Kyles</u> v. <u>Whiltley</u>, 514 U.S. 419 (1985); <u>United States</u> v. <u>Bagley</u>, <u>supra</u>; <u>United States</u> v. <u>Augurs</u>, <u>supra</u>; <u>Brady</u> v. <u>Maryland</u>, <u>supra</u>-, **se centra en la celebración del juicio, lógicamente después de la acusación**. En esa situación, para que proceda el dictamen de nulidad de la condena y un nuevo juicio, tiene que establecerse satisfactoriamente que de haberse revelado oportunamente la evidencia exculpatoria, razonablemente el **resultado del juicio hubiese sido distinto**.

[24] Es claro pues, que distinto al criterio mayoritario, nuestro ordenamiento procesal penal no impone la obligación al Ministerio Fiscal de revelar evidencia **antes de presentar acusación**, esto es, en procedimientos anteriores al juicio, como es la Vista Preliminar. El deber surge **luego de la acusación**, previa la correspondiente Vista Preliminar. La razón es sencilla: en las etapas previas a la acusación, se busca que el Estado tenga base suficiente para continuar con el proceso judicial y no, establecer culpabilidad o inocencia, escudriñando las múltiples defensas y teorías que pueda interponer o elaborar un acusado. <u>Pueblo</u> v. <u>Andaluz</u>, <u>supra</u>; <u>Pueblo</u> v. <u>Rivera Rodríguez</u>, <u>supra</u>; <u>Pueblo</u> v. <u>Rodríguez Aponte</u>, 116 D.P.R. 653 (1985); <u>Pueblo</u> v. <u>López Camacho</u>, 98 D.P.R. 700 (1970).

[25] Aclarado el prisma decisorio, bajo el limitado ámbito de la Regla 23(c) regulatoria de la Vista Preliminar, la defensa tampoco tenía derecho a que el Ministerio Fiscal revelara las manifestaciones extrajudiciales **no juradas** que conociera había hecho el testigo Santana Báez. Nuevamente vemos que esta Regla dispone taxativamente que "al ser requerido para ello el fiscal pondrá a disposición de la persona las **declaraciones juradas** que tuviera en su poder de testigos que haya puesto a declarar en la vista." **La**

VI

Recapitulando. <u>Primero</u>, **en <u>recta</u> juridicidad, no estamos ante prueba exculpatoria <u>per se</u>; como coautor o en la alternativa, vía admisiones, <u>todas</u> las manifestaciones de Santana Báez, <u>inculpan siempre</u> a los peticionarios Rodríguez Galindo y Ortiz Vega.** <u>Segundo</u>, **una adjudicación y revisión de toda la prueba desfilada y lo acontecido en la Vista Preliminar pone de manifiesto y sostiene la conclusión de que razonablemente no se variaría la determinación de causa probable; fue "conforme a derecho" bajo los parámetros jurisprudenciales de credibilidad pertinentes.** Esta situación se impone, independientemente de que el testimonio de Santana Báez se examine como que presenció el secuestro y la agresión que culminó en el crimen de Barbarita o que, mintió en ese extremo y advino en su conocimiento por la admisión de su amigo Rodríguez Galindo, (en unión a la otra prueba testifical y documental corroborante). <u>Tercero</u>, el descubrimiento de prueba disponible en virtud de la Regla 95(a)(2) –declaraciones **no juradas**, de testigos de cargo que hayan prestado testimonio en la Vista de Causa Probable (Regla 6) o en Vista Preliminar (Regla 23), salvo las **exculpatorias <u>per se</u>- comienza con la presentación de la acusación, no antes.** <u>Cuarto</u>, por diligencias del Ministerio Fiscal, los peticionarios poseían y poseen para el juicio la

---

**declaración que pretendieron descubrir en este caso no fueron juradas**; están claramente excluidas de la disposición reglamentaria anterior. El Ministerio Público cumplió cabalmente su deber y durante la Vista Preliminar, entregó a la defensa las **declaraciones juradas** de los testigos que allí declararon.

Igual solución se impone bajo la norma adoptada en <u>Pueblo</u> v. <u>Ribas</u>, 83 D.P.R. 386 (1961) y expandida en <u>Pueblo</u> v. <u>Delgado López</u>, 106 D.P.R. 441 (1977). (En ambos casos revocamos la denegatoria de instancia sobre acceso a declaraciones anteriores de testigos, luego de que fueron examinados en el interrogatorio directo **durante el juicio).** El acusado tiene la oportunidad de obtener copia de cualquier declaración que haya prestado un testigo de cargo, **si la solicita luego de haber prestado testimonio en el juicio y cuando esté en el turno de repregunta** y la misma se refiere a los hechos en controversia ventilándose.

Criterio similar aplica al argumento de que Fiscalía ocultó el resultado de la prueba de polígrafo. **Primero,** no había derecho a descubrirla antes ni durante la Vista Preliminar. Cabe señalar, sin embargo, que Fiscalía la entregó a la defensa antes del juicio, cumpliendo así con el debido proceso de ley. **Segundo,** <u>quaere</u>, si en nuestra jurisdicción el resultado de la prueba de polígrafo es admisible. <u>Rattan Specialties, Inc.</u> v. <u>Arroyo</u>, 117 D.P.R. 35 (1986) consignó serias dudas sobre su confiabilidad. **Tercero, difícilmente pueden estimarse exculpatorias.** Según indicado, las respuestas en las que Santana Báez fue veraz o mintió en la prueba del 22 de octubre de 1998 – conforme la opinión pericial del poligrafista- **incriminan a los peticionarios Rodríguez Galindo y Ortiz Vega.**

Coincidimos con el criterio del reputado Tribunal de Circuito de Apelaciones, de que será en el juicio que se evaluará la suficiencia de la prueba del Ministerio Fiscal, dirimirán las aspectos de credibilidad, incluso las distintas manifestaciones del testigo Santana Báez y validez de las identificaciones. No es menester elaborar que carece de méritos el pedido para suprimir la identificación de los acusados Rodríguez Galindo y Ortiz Vega. No cabe argumentar que se trata de evidencia obtenida sin orden judicial, sobre la cual recae presunción de invalidez.

Los autos revelan que la defensa tuvo amplia oportunidad en la vista celebrada a esos fines, de persuadir al juzgador de que la identificación realizada mediante rueda de detenidos fue lo suficientemente sugestiva para invalidarse. <u>Pueblo</u> v. <u>Colón Bernier</u>, res. en 20 de abril de 1999, 99 TSPR 58. **No tuvieron éxito y el juzgador, quien aquilató dicha prueba, merece nuestra total deferencia.**

alegada evidencia exculpatoria; **momento en que debe evaluarse finalmente la credibilidad que debe merecer Santana Báez.**

Finalmente, nos preocupa que, contrario a las normas prevalecientes, los abogados de los peticionarios Ortiz Vega y Rodríguez Galindo hayan presentado ante este foro apelativo la declaración jurada **reciente** de la Sra. Norkalis Báez —madre del testigo de cargo Santana Báez—, **aún cuando aceptan que nunca ha formado parte del expediente ni de los autos judiciales. Somos Tribunal Supremo, no de Primera Instancia, sin autoridad para recibirlo; menos para tomarla en cuenta. La mayoría debió ordenar su inmediato desglose.**

"Cuando se comunica a las grandes masas de gentes cosas lejanas, extrañas y complejas, la verdad sufre considerable-mente y, a veces, una distorsión radical. **Lo complejo se torna en simple, lo hipotético en dogmático, y lo relativo en absoluto.**" Walter Lippman, The Public Philosophy, (1955), en Daniel B. Baker, <u>Power Quotes</u>, (1992), pág. 164. (Traducción nuestra, énfasis suplido).

**En este caso, aflora un desmedido afán publicitario. Aconsejamos prudencia a los fiscales y abogados de la defensa. Bajo nuestro ordenamiento jurídico y normas éticas, los casos, aún los más sonados (a veces más tristes), se litigan y adjudican —ganan o pierden— en los tribunales a base de un análisis integral de la prueba; no con titulares ni noticias originadas en conferencias de prensa.**

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**


El Pueblo de Puerto Rico

    Recurrido

    v.

José L. Ortiz Vega y               CC-1999-297      Certiorari
Eugenio J. Rodríguez Galindo

    Acusados y Peticionarios


**Opinión Disidente emitida por el Juez Asociado señor Hernández Denton**


**San Juan, Puerto Rico, a 8 de octubre de 1999.**

La mayoría de este Tribunal resuelve hoy que la determinación en vista preliminar de que existía causa probable para acusar a lo señores Ortiz Vega y Rodríguez Galindo por el asesinato y el secuestro de la niña Liliana Bárbara Cepeda fue contraria a derecho. Esto en virtud de que el Ministerio Fiscal no entregó a la representación legal de los acusados unas declaraciones no juradas y una grabación que tenía en su posesión, en las que el principal testigo de cargo, el señor Santana Báez, modificaba lo expresado en una declaración jurada anterior, respecto a su condición de testigo ocular de los hechos.

Aunque originalmente entendimos que el recurso presentado levantaba serias y graves imputaciones sobre la conducta del Ministerio Público, luego de un minucioso examen del expediente, de las minutas de la vista preliminar y de los autos originales, entendemos que aunque el Estado tenía la obligación, dado los hechos tan particulares del caso de autos, de entregar a la defensa las declaraciones y la grabación del testigo principal de cargo, la determinación de causa probable para acusar está avalada por la totalidad de la prueba presentada.

## I.

Consideramos que la pregunta a contestarse es si considerada la totalidad de la evidencia testifical y documental presentada en la vista preliminar, el Estado satisfizo el quántum de prueba necesario para que el juzgador llegara a la determinación de que existía causa probable para acusar.

Reiteradamente hemos aseverado que aunque el Estado tiene la obligación de presentar evidencia suficiente para persuadir al magistrado que preside la vista preliminar de la existencia de causa probable para acusar, el quántum de prueba requerido no es el de más allá de duda razonable, y ni siquiera el de preponderancia de prueba. De lo que se trata es que el Estado demuestre que cuenta con evidencia suficiente, que de ser creída por el juzgador, establece los elementos del delito y la conexión del imputado con el mismo. A la luz de nuestra jurisprudencia reiterada:

> Para que la determinación de causa probable se haga conforme a la ley y a derecho, el juicio del magistrado debe basarse en alguna prueba que demuestre que existe causa probable para creer que el acusado cometió el delito. En ausencia total de esa prueba, la determinación de causa probable por un magistrado no se ha hecho con arreglo a la ley y a derecho, y en su consecuencia, procede la moción para desestimar la acusación, bajo el susodicho inciso "p" de la Regla 64. Vázquez Rosado V. Tribunal Superior, 100 D.P.R. 592, 594 ((1972); Pueblo v. González Pagán, 120 D.P.R. 684 (1988); Pueblo v. Rivera Alicea, 125 D.P.R. 37 (1989).

No hay duda de que las manifestaciones extrajudiciales del testigo Santana Báez hubiesen sido útiles a la defensa para impugnar la credibilidad de dicho testigo. En las mismas recantó su declaración anterior sobre su presencia durante la comisión del secuestro y del asesinato, y afirmó que su conocimiento de lo acontecido se debía a que el señor Rodríguez Galindo, uno de los coacusados, se lo había contado.[26] Indicó, que su versión original en la que se colocaba como testigo ocular se debió a que había sido presionado por los agentes del orden público para que declarara que había presenciado los hechos.

Sin embargo, aun reconociendo la utilidad que para la defensa hubiese representado el tener a su disposición dichas declaraciones no juradas y la grabación del testigo Santana Báez, e independientemente de si calificamos dicha evidencia como prueba exculpatoria absoluta o relativa, consideramos que la evidencia presentada en la vista preliminar fue suficiente para satisfacer el quántum de prueba para acusar, según establecido por nuestra jurisprudencia. Veamos.

Un examen minucioso de las minutas de la vista preliminar demuestra que el Ministerio Público, además de presentar como testigo al señor Santana Báez, presentó además varios otros testigos para que declararan sobre la investigación realizada, los hallazgos en la escena del crimen y sobre los traumas presentados por la niña. Entre ellos a la Sra. Carmen Casado del C.I.C. Homicidios, San Juan; al policía Edgardo Rivera Navedo; y a la Sra. Lydia Alvarez Pagán, Directora Ejecutiva del Instituto de Ciencias Forenses. El Ministerio Fiscal sometió además prueba documental, entre la que se destaca el informe médico forense, y fotos sobre el cuerpo de la niña con los traumas recibidos, así como de la escena del crimen.

Examinada la totalidad de la prueba presentada, y tomando en consideración que las versiones ofrecidas por el señor Santana Báez en las declaraciones no juradas y en la grabación, aunque lo colocan fuera de la escena del crimen, **relacionan directamente a los acusados con el crimen, en virtud de una admisión de parte**, y tomando en cuenta los detalles que ofreció sobre lo acontecido, así como la restante prueba documental y testifical, consideramos que no procede la desestimación de causa probable en virtud de la Regla 64(p).

Lo relatado por el señor Santana Báez respecto a lo acontecido, independientemente de si advino conocimiento de ello por haber presenciado los hechos, o porque el coacusado Rodríguez Galindo se lo contó, y corroborado por la otra prueba documental y testifical sobre la escena del crimen y los traumas sufridos por la niña, nos lleva a la conclusión de que no estamos ante un caso de "ausencia total de prueba".

## II.

Nos queda por considerar si el hecho de que el Ministerio Público no pusiera a disposición de la defensa las declaraciones no juradas y la grabación del testigo Santana Báez, antes de que ésta llevara a cabo su contrainterrogatorio, con el propósito de que la defensa pudiera

---

[26] Coincidimos con lo expresado por el Juez Asociado señor Negrón García en su Opinión Disidente, de que dicha declaración configura una admisión de parte, en cuanto al acusado señor Rodríguez Galindo. Regla 62(A) de Evidencia, 32 Ap. IV R.62.

impugnar la credibilidad de dicho testigo, conlleva automáticamente la determinación de que procede celebrarse una nueva vista preliminar.

Nuestra jurisprudencia, así como la federal, ha tenido la oportunidad de pautar la normativa sobre las consecuencias de que el Estado no ponga a disposición de la defensa evidencia exculpatoria durante la celebración del juicio. La norma dispone que no toda situación en que el Ministerio Público no haya entregado prueba exculpatoria a la defensa conlleva automáticamente una revocación de la convicción y la concesión de un nuevo juicio. Corresponde al tribunal apelativo examinar si la evidencia exculpatoria no entregada, era de tal naturaleza que, de haber sido presentada al juzgador de los hechos, el resultado del juicio hubiese sido uno distinto. Es decir, la evidencia exculpatoria debe ser lo suficientemente determinante como para que, a la luz de todo el récord, se pueda razonablemente inferir que el veredicto hubiese sido otro. Pueblo v Echevarría Rodríguez I, 128 DPR 299 (1991); U.S. v. Bagley, 473 U.S. (1985).

Aunque el Estado, dado los hechos tan particulares del caso de autos, debió entregar las declaraciones no juradas y la grabación del testigo principal de cargo a la defensa, nos corresponde determinar, a la luz de lo anteriormente pautado, si es razonable inferir, que de haberse puesto dicha prueba en posesión de la defensa para impugnar el testimonio del testigo Santana Báez, el resultado de la vista preliminar hubiese sido distinto.

En virtud de lo anteriormente expresado sobre el quántum de prueba a satisfacerse en la determinación de causa probable para acusar, así como de un examen integral de lo acontecido en la vista preliminar, somos del criterio que el resultado de la vista preliminar no hubiese variado. El testigo Santana Báez, describió, tanto en su declaración jurada, como en su testimonio en vista preliminar, los detalles y pormenores del secuestro y del asesinato de la niña. Describió el auto utilizado, los golpes propiciados, así como la escena del secuestro y el crimen.

Las declaraciones no juradas y la grabación, no modifican, ni añaden nueva información respecto a los hechos sucedidos, o sobre la relación de los acusados con el crimen. La variación crucial versa sobre cómo el testigo advino conocimiento de los mismos. La impugnación del testigo, de haber tenido acceso la defensa a tal información antes del contrainterrogatorio, hubiese versado sobre su recantación como testigo ocular, con el consiguiente efecto de impugnar su credibilidad.[27]

Ante esta situación, y considerando la totalidad de lo acontecido en la vista preliminar no podemos razonablemente inferir que el resultado de la vista preliminar hubiese sido uno distinto. El testimonio detallado del señor Santana Báez, así como la totalidad de la otra evidencia presentada, aun asumiendo una vigorosa impugnación de dicho testigo en virtud de las modificaciones posteriores a su testimonio sobre su presencia en el lugar del delito, son suficientes para una determinación de causa probable para acusar.

Coincidimos con lo expresado por el Juez Asociado señor Negrón García en su Opinión Disidente de que "una adjudicación y revisión de toda la prueba desfilada y lo acontecido en la Vista Preliminar pone de manifiesto y sostiene la conclusión de que razonablemente no se variaría la determinación de causa probable; fue 'conforme a derecho' bajo los parámetros jurisprudenciales de credibilidad pertinentes."

Por lo anteriormente expresado, disentimos.


Federico Hernández Denton

---

[27] Debemos recordar que la falta de veracidad de un testigo en cuanto a parte de su testimonio no implica que el juzgador deba descartar absolutamente el resto de su declaración. Pueblo v. Chévere Heredia, res. 22 de agosto de 1995, 139 DPR__ (1995).

Juez Asociado

Juez Asociado